# SAVAGE *v.* JONES, STATE CHEMIST OF THE STATE OF INDIANA.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

No. 68.   Argued January 18, 1912.—Decided June 7, 1912.

Where appellant, as complainant below, attacked as unconstitutional a state statute under which the sale of his product was interfered with by the state officer enforcing the statute, and a general demurrer for want of equity is sustained, this court has jurisdiction of the appeal; nor will the appeal be dismissed because the bill in one of its allegations asserted that complainant's product was not one of those specified in the act, if, as in this case, the bill also alleged that the proper state officer had construed the statute as applicable thereto.

Sales made in one State to be delivered free on board at a point therein, to be delivered to consumers in another State in the original unbroken packages, freight to be paid by purchaser, constitutes interstate commerce.

Commerce among the States is not a technical legal conception, but a practical one drawn from the course of business. Protection accorded to interstate commerce by the Federal Constitution extends to the sale by the receiver of the goods in the original packages.

An attack by state authorities upon purchasers of goods manufactured in and shipped from another State, inflicts injury upon the manufacturer by reducing the interstate sales, and if this result can only be prevented by complying with illegal demands, under an unconstitutional state statute, equity will grant relief.

Regulating the sale of food for domestic animals is properly within the scope of the state police power, and the vendors of such food are not deprived of their property without due process of law by a regulation requiring disclosure of ingredients and minimum percentage of fat and proteins, disclosure of the formula for combination not being required; and so *held* as to the statute of Indiana of 1907.

*Quære* whether a State can require disclosure of formulas for trade secret for mixture of a harmless article whose value depends upon the mixture.

While the State cannot, under cover of exerting its police power, directly regulate or burden interstate commerce, a police regulation which has real relation to the proper protection of the people, and is reasonable in its terms, and does not conflict with any valid act of Congress, is not unconstitutional because it may incidentally affect interstate commerce.

Where a state police statute involving inspection of goods is enforced by the affixing of stamps, it will not be held unconstitutional as a revenue measure in disguise if the bill does not allege any facts to show that the charge for stamps is unreasonable and the total sale is so much in excess of the cost of inspection as to impute bad faith.

One whose sales are so large as to require stamps far in excess of the minimum amount to be issued is not prejudiced by the requirement to purchase such minimum amount of stamps.

No state statute which even affects incidentally interstate commerce is valid if it is repugnant to the Federal Food and Drugs Act of June 30, 1906, the object of which is to prevent adulteration and misbranding and keep adulterated and misbranded articles out of interstate commerce.

Where an act of Congress relating to a subject on which the State may act also, limits its prohibitions, it leaves the subject open to state regulation as to the prohibitions which are unenumerated.

In determining whether a Federal act overrides a state law, the

entire scheme must be considered and that which needs must be implied has no less force than that which is expressed.

The intent of Congress to supersede the exercise by the States of their police power will not be inferred unless the act of Congress, fairly interpreted, is in actual conflict with the law of the State.

The statute of Indiana regulating the sale, and requiring formula of ingredients of, concentrated commercial food for stock is a proper and reasonable exercise of legislative police authority for the protection of the people of the State. The act is not unconstitutional as depriving a vendor of such food who lives in another State and ships it therefrom to Indiana either as a regulation of, or burden upon, interstate commerce, as depriving any vendor thereof of his property without due process of law, or as a revenue measure beyond the power of the State, nor does the requirement for publishing the ingredients conflict in any manner with the Food and Drugs Act of 1906.

Although the Food and Drugs Act prohibits misbranding it does not require publication of ingredients, and in that respect the field is left open for state legislation.

THIS is an appeal from a decree of the Circuit Court sustaining a demurrer to the bill for want of equity. The suit was brought by Marion W. Savage, a citizen of Minnesota, to restrain the defendant, the State Chemist of Indiana, from taking proceedings to enforce an act of the General Assembly of that State (Acts 1907, chapter 206) as applied to the sales of the complainant's product, a preparation for domestic animals known as "International Stock Food." The act is set forth in the margin.[1]

---

[1] Acts 1907, Chapter 206, Page 354, Indiana.

An Act to provide for the inspection and analysis of, and to regulate the sale of concentrated commercial feeding stuff in the State of Indiana; to prohibit the sale of fraudulent or adulterated concentrated commercial feeding stuffs; to define the term concentrated commercial feeding stuffs; to provide for guarantees of the ingredients of concentrated commercial feeding stuffs; for the affixing of labels and stamps to the packages thereof, as evidence of the guarantee and inspection thereof; to provide for the collection of an inspection fee from the

The bill alleges that the complainant has for many years been engaged in Minnesota in the manufacture of medic-

---

manufacturers of, or dealers in concentrated commercial feeding stuffs; to fix penalties for the violation of the provisions of this act, and to authorize the expenditure of the funds derived from the inspection fees.

SECTION 1. *Be it enacted by the general assembly of the State of Indiana,* That before any concentrated commercial feeding stuff is sold, offered or exposed for sale in Indiana, the manufacturer, importer, dealer, agent or person who causes it to be sold, or offered for sale, by sample, or otherwise, within this state, shall file with the state chemist of Indiana at the Indiana agricultural experiment station, Purdue university, a statement that he desires to offer such concentrated commercial feeding stuff for sale in this state, and also a certificate, the execution of which shall be sworn to before a notary public, or other proper official, for registration, stating the name of the manufacturer, the location of the principal office of the manufacturer, the name, brand or trade-mark under which the concentrated commercial feeding stuff will be sold, the ingredients from which the concentrated commercial feeding stuff is compounded, and the minimum percentage of crude fat or crude protein allowing one per cent. of nitrogen to equal six and twenty-five hundredths per cent. of protein, and the maximum percentage of crude fibre which the manufacturer, or person offering the concentrated commercial feeding stuff for sale guarantees it to contain; these constituents to be determined by the methods recommended by the association of official agricultural chemists of the United States.

SEC. 2. Any person, company, corporation or agent that shall sell or offer, or expose for sale, any concentrated commercial feeding stuff in this state, shall affix, or cause to be affixed to every package or sample of such concentrated commercial feeding stuff in a conspicuous place on the outside thereof, a tag or label which shall be accepted as a guarantee of the manufacturer, importer, dealer or agent and which shall have plainly printed thereon in the English language, the number of net pounds of concentrated commercial feeding stuff in the package, the name, brand, or trade-mark under which the concentrated commercial feeding stuff is sold, the name of the manufacturer, the location of the principal office of the manufacturer, and the guaranteed analysis stating the minimum percentage of crude fat and crude protein, determined as described in section 1, and the ingredients from which the concentrated commercial feeding stuff is compounded. For each one hundred pounds, or fraction thereof, the person, company, corporation or agent, shall also affix the stamp purchased from the state chemist, showing

inal preparations, one of which is called "International Stock Food" and is sold in every State in the Union as

that the concentrated commercial feeding stuff has been registered as required by section one of this act, and that the inspection tax has been paid. When concentrated commercial feeding stuff is sold in bulk a tag as hereinbefore described, and a state chemist stamp shall be delivered to the consumer with each one hundred pounds, or fraction thereof: *Provided,* That for wheat bran a special stamp covering fifty pounds shall be issued on request, and one such stamp, attached to the tag hereinbefore mentioned, shall be delivered to the purchaser with each fifty pounds or fraction thereof.

SEC. 3. The state chemist shall register the facts set forth in the certificate required by section one of this act in a permanent record, and shall furnish stamps or labels showing the registration of such certificate to manufacturers or agents desiring to sell the concentrated commercial feeding stuff so registered at such times and in such numbers as the manufacturers or agents may desire: *Provided,* That the state chemist shall not be required to sell stamps or labels in less amount than to the value of five dollars ($5.00) or multiples of five dollars for any one concentrated commercial feeding stuff: *Provided, further,* That the state chemist shall not be required to register any certificate unless accompanied by an order and fees for stamps or labels to the value of five dollars ($5.00) or some multiple of five dollars: *Provided, further,* That such stamps or labels shall be printed in such form as the state chemist may prescribe: *Provided, further,* That such stamps or labels shall be good until used.

SEC. 4. On or before January 31st of each year, each and every manufacturer, importer, dealer, agent or person, who causes any concentrated commercial feeding stuff to be sold or offered or exposed for sale in the State of Indiana shall file with the state chemist of Indiana a sworn statement, giving the number of net pounds of each brand of concentrated commercial feeding stuff he has sold or caused to be offered for sale in the state for the previous year ending with December 31st: *Provided,* That when the manufacturer, jobber or importer of any concentrated commercial feeding stuff shall have filed the statement aforesaid, any person acting as agent for said manufacturer, importer or jobber, shall not be required to file such statement.

SEC. 5. For the expense incurred in registering, inspecting and analyzing concentrated commercial feeding stuffs, the state chemist shall receive for stamps or labels furnished, one dollar per hundred: *Provided,* That for wheat bran a special stamp as required by section 2 of

well as in many foreign countries; that he has invested
large amounts of money in building up a lucrative trade

this act shall be furnished at fifty cents per hundred. The money for
said stamps, or labels, shall be forwarded to the said state chemist, who
shall pay all such fees received by him to the director of the Indiana
agricultural experiment station, Purdue university, by whom they shall
be paid into the treasury of said Indiana agricultural experiment sta-
tion, the board of control of which shall expend the same, on proper
vouchers to be filed with the auditor of state in meeting all necessary
expenses in carrying out the provisions of this act, including the em-
ployment of inspectors, chemists, expenses in procuring samples, print-
ing bulletins giving the results of the work of feeding stuff inspection,
as provided for by this act, and for any other expenses of said Indiana
agricultural experiment station as authorized by law. The director of
said experiment station shall make to the governor, on or before Feb-
ruary 15th of each year, a classified report showing the total receipts
and expenditures of all fees received under the provisions of this act.

 SEC. 6. Any person, company, corporation or agent that shall offer
for sale, sell or expose for sale any package or sample or any quantity
of any concentrated commercial feeding stuff which has not been regis-
tered with the state chemist as required by section 1 of this act, or
which does not have affixed to it the tag and stamp required by sec-
tion 2 of this act, or which is found by an analysis made by or under the
direction of the state chemist to contain a smaller percentage of crude
fat or crude protein than the minimum guarantee, or which shall be
labeled with a false or inaccurate guarantee, or who shall adulterate any
concentrated commercial feeding stuff with foreign mineral matter or
other foreign substance, such as rice hulls, chaff, mill sweepings, peanut
shells, corn bran, corncob meal, oat hulls, oat clippings, or other ma-
terials of less or of little or no feeding value without plainly stating
on the label hereinbefore described, the kind and amount of such mix-
ture, or who shall adulterate with any substance injurious to the health
of domestic animals, or who shall alter the stamp, tag or label of the
state chemist, or shall use the name and title of the state chemist on a
stamp, tag or label not furnished by the state chemist, or shall use the
stamp, tag or label of the state chemist the second time, or shall refuse
or fail to make the sworn statement required by section 4 of this act,
shall be deemed guilty of a misdemeanor, and on conviction thereof
shall be fined in the sum of fifty dollars for the first offense, and in the
sum of one hundred dollars for each subsequent offense. In all litiga-
tion arising from the purchase or sale of any concentrated commercial

in Indiana among the retail druggists, many hundreds of whom were "buying, carrying in stock and retailing to

---

feeding stuff in which the composition of the same may be involved a certified copy of the official analysis signed by the state chemist shall be accepted as prima facie evidence of the composition of such concentrated commercial feeding stuff: *Provided,* That nothing in this act shall be construed to restrict or prohibit the sale of concentrated commercial feeding stuff in bulk to each other by importers, manufacturers or manipulators who mix concentrated commercial feeding stuff for sale, or as preventing the free, unrestricted shipment of these articles in bulk to manufacturers or manipulators who mix concentrated commercial feeding stuff for sale, or to prevent the state chemist, or the Indiana agricultural experiment station, or any person or persons deputized by said state chemist, making experiments with concentrated commercial feeding stuffs for the advancement of the science of agriculture.

SEC. 7. The state chemist or any person by him deputized is hereby empowered to procure from any lot, parcel or package of any concentrated commercial feeding stuff offered for sale or found in Indiana a quantity of concentrated commercial feeding stuff not to exceed two pounds: *Provided,* That such sample shall be drawn during reasonable business hours, or in the presence of the owner of the concentrated commercial feeding stuff or of some person claiming to represent the owner.

SEC. 8. Any person who shall prevent or strive to prevent the state chemist, or any person deputized by the state chemist, from inspecting and obtaining samples of concentrated commercial feeding stuff, as provided for in this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in the sum of fifty dollars for the first offense, and in the sum of one hundred dollars for each subsequent offense.

SEC. 9. The state chemist is hereby empowered to prescribe and enforce such rules and regulations relating to concentrated commercial feeding stuff as he may deem necessary to carry into effect the full intent and meaning of this act, and to refuse the registration of any feeding stuff under a name which would be misleading as to the materials of which it is made, or when the percentage of crude fiber is above or the percentage of crude fat or crude protein below the standards adopted for concentrated commercial feeding stuffs. The state chemist is further empowered to refuse to issue stamps or labels to any manufacturer, importer, dealer, agent or person who shall sell or offer or expose for sale any concentrated commercial feeding stuff in this state

the public" the complainant's preparations; that the complainant's gross annual sales in Indiana amount to many thousands of dollars; that the "International Stock Food" possesses effective curative properties for various diseases of domestic animals and is composed of medicinal roots, herbs, seeds, and barks, combined by a secret formula of great value; and that the disclosure to his competitors of the proportion of the ingredients and the manner of combination would seriously injure his business; that the commercial designation "International Stock Food" is not used by the complainant as descriptive of feed of any kind, and is not so understood by retail druggists and purchasers, but is well known to the public as a trade name of a medicine for domestic animals protected under trade-

and refuse to submit the sworn statement required by section 4 of this act.

SEC. 10. It shall be the duty of every prosecuting attorney to whom the state chemist shall report any violation of this act to cause proceedings to be commenced against the person or persons so violating the act, and the same prosecuted in the manner required by law.

SEC. 11. The term "concentrated commercial feeding stuff" as used in this act, shall include linseed meals, cocoanut meals, gluten feeds, gluten meals, germ feeds, corn feeds, maize feeds, dairy feeds, starch feeds, sugar feeds, dried brewers' grains, malt sprouts, dried distillers' grains, dried beet refuse, hominy feeds, cerealine feeds, rice meals, rice bran, rice polish, peanut meals, oat feeds, corn and oat feeds, corn bran, wheat bran, wheat middlings, wheat shorts and other mill by-products not excluded in this section, ground beef or fish scraps, dried blood, blood meals, bone meals, tankage, meat meals, slaughter house waste products, mixed feeds, clover meals, alfalfa meals and feeds, peavine meal, cotton seed meal, velvet bean meal, sucrine, mixed feeds, and mixed meals made from seeds or grains, and all materials of similar nature used for food for domestic animals, condimental feeds, poultry feeds, stock feeds, patented proprietary or trade and market stock and poultry feeds; but it shall not include straw, whole seeds, unmixed meals made directly from the entire grains of wheat, rye, barley, oats, Indian corn, buckwheat and broom corn, nor wheat flours or other flours.

SEC. 12. All laws and parts of laws in conflict with this act are hereby repealed.

marks in the United States; that on investigations made by the United States internal revenue department it was determined that the preparation was not feeding stuff nor a condimental stock food, but was a proprietary or patent medicine within the meaning of the revenue laws of 1863 and 1898; and that subsequent to the enactment by Congress of the Food and Drugs Act of 1906 (June 30, 1906, 34 Stat. 768, c. 3915), the administrative officers of the United States Government duly determined that it was a medicine and not a food within the meaning of that act.

The bill then avers the passage of the act above mentioned by the legislature of Indiana and sets forth the provisions of §§ 1, 2, 8, 9 and 11. It is alleged that the defendant, the State Chemist of Indiana, is asserting that the complainant's manufacture is one of the concentrated commercial feeding stuffs covered by the act, and that it is the duty of the complainant to comply with its provisions with reference to its sale in Indiana, "and has stated and declared to your orator, and now threatens that unless your orator has attached in a conspicuous place on the outside of each package of your orator's said medicinal preparation offered for sale within the State of Indiana, a printed statement, clear and truthful, certifying among other things the name of the manufacturer and shipper, the place of manufacture, the place of business and chemical analysis stating the percentage of crude protein, crude fat and crude fiber contained in said preparation and have all its constituents determined by the methods adopted by the session of official agricultural chemists, and shall also state upon said package the names of each ingredient of which said preparation is composed, he will cause the arrest and prosecution of every person dealing or trading in the medicinal preparation of your orator within the State of Indiana." That the defendant has sent, or caused to be sent, broadcast

throughout the State of Indiana to dealers and others who are customers, directly or indirectly, of complainant many thousand circular letters warning them against the sale of said preparation and threatening that prosecution will be instituted against all persons engaged in the sale thereof, unless and until the complainant shall have complied with the provisions of said act.

It is also alleged that the sales made by the complainant "in the State of Indiana are made at the city of Minneapolis, State of Minnesota, to be delivered free on board of cars at Minneapolis, Minnesota, and delivered to purchasers and consumers within the State of Indiana in the original unbroken packages, freight being paid thereon by the consumers and purchasers." That unless restrained the defendant will continue to annoy and intimidate the numerous persons engaged in selling the preparation in Indiana, by threats of criminal prosecution, and will report to the various prosecuting attorneys of the State the sales that may come to his notice and instigate prosecutions of the sellers as violators of the statute, thereby obstructing the complainant in the conduct of his business in the State of Indiana and interfering with his property rights to his irreparable injury, for which there is no adequate legal remedy. That many hundreds of persons engaged in selling the preparation have already discontinued their purchases and sales because of the fear of criminal prosecution induced by the defendant's threats, and that large numbers of those who are still handling it will be induced by such threats to discontinue its sale.

The bill further avers that the complainant's preparation is not in any sense either concentrated commercial feeding stuff, or condimental stock feed, or a patent proprietary stock feed within the proper construction of the act of Indiana, and is not advertised as possessing nutritive properties or used except as medicine; that the complainant does not "claim that said medicinal preparation con-

tains any crude protein or crude fat;" that it does not contain, nor is it claimed on behalf of the defendant that it contains, any ingredient that is deleterious or injurious to animal life or health; that it is prescribed and administered in small doses as medicine and "that the only nutritive substance or ingredients . . . are employed as diluents in so small an amount as to produce no feeding effect whatever, but for the sole purpose of rendering medicinal bitter roots, herbs, barks and seeds more acceptable to the animal stomach;" that directions for use accompany each package and in every case there is a statement plainly showing that the preparation is to be used to cure disease and not in place of or as a substitute for any grain or feed. That nevertheless, the defendant, who in his official capacity is charged by law with the enforcement of the statute, has construed it to apply to complainant's product.

That under § 3 of the statute of Indiana the State Chemist is to register the facts set forth in the certificate required by § 1 as a permanent record and to furnish stamps or labels, showing such registration, to manufacturers or agents desiring to sell the concentrated commercial feeding stuff so registered in amounts not less than the value of five dollars or multiples of five dollars for any one such product; that by § 5 the State Chemist is to receive one dollar for each one hundred stamps, and that the proceeds thus derived are to be paid into the treasury of the Indiana Agricultural Experiment Station to be expended in carrying out the provisions of the statute and for any other expenses of such station as authorized by law.

That the statute, and particularly §§ 1, 2, 7, 8 and 9, are repugnant to the Fourteenth Amendment of the Constitution of the United States in that they require manufacturers of proprietary stock feed and condimental feeds, arbitrarily, without compensation and without due proc-

ess of law, whether such preparation contain any poisonous or deleterious element or ingredient, to disclose the formulæ by which they are compounded, and the ingredients and proportions thereof, which embody valuable trade secrets; and that if the act is enforced against the complainant he will be deprived of his property contrary to the said Amendment.

That the statute also violates § 8 of Art. I of the Constitution of the United States as an unreasonable interference with interstate commerce in which the complainant is engaged.

That further, the statute is invalid under § 19 of Art. IV of the constitution of the State of Indiana in that the title does not express the requirement that manufacturers or dealers shall disclose the formulæ by which their products are manufactured or the ingredients or proportions.

That for many years the complainant's preparation has been offered for sale in packages of different sizes, holding respectively 24 ounces, 3 pounds, 6 pounds and 25 pounds; that under the terms of the statute the complainant would be required to pay the same amount of tax for a package of 24 ounces that other commodities and manufacturers thereof pay for a package of one hundred pounds; and that this discrimination is unreasonable and unconstitutional.

That the enforcement of the requirement as to the affixing of stamps and payment therefor is a tax upon the complainant's property and business, and is not a license fee determined by any reasonable requirement, or for the purpose of carrying out the inspection required, but, on the contrary, under the guise of a police regulation constitutes a measure for raising revenue for the general work and expense of the Indiana Agricultural Experiment Station. That the act is contrary to § 10 of Art. I of the Constitution of the United States, that no State shall without the consent of Congress lay any imposts or duties on imports,

except what may be absolutely necessary for executing its inspection law.

The bill prays that the defendant may be enjoined from taking any action against the complainant, interfering with his right to vend and convey his preparations in the State of Indiana, from instituting any proceedings to punish him for failure to comply with the defendant's demands, from giving out orally or in writing to the various prosecuting officers of the State, or to any other agents thereof charged with the enforcement of its law, or to the public, any threats of prosecution or information upon which prosecutions are requested, or may be based, and from otherwise seeking to prevent the conduct of the complainant's business in the State or to discredit the reputation of his remedy.

The defendant demurred to the bill upon the ground that it was wholly without equity, and that the court was without jurisdiction. Upon the former ground the bill was dismissed.

*Mr. M. H. Boutelle* for appellant:

Appellant is entitled to equitable relief. *Scully* v. *Bird,* 209 U. S. 481.

The constitutional question presented establishes the right of direct appeal from the decree of the Circuit Court to this court. *Scott* v. *Donald,* 165 U. S. 58; *Penn Ins. Co.* v. *Austin,* 168 U. S. 694; *Holder* v. *Aultman,* 169 U. S. 88; *Loeb* v. *Columbia Twp.,* 179 U. S. 472; *Spreckels Sugar Ref. Co.* v. *McClain,* 192 U. S. 397; *Mississippi R. R. Comm.* v. *Ill. Cent. Ry.,* 203 U. S. 335.

Every question arising upon the record is open for consideration on the present appeal. *Carey* v. *Hudson Ry. Co.,* 150 U. S. 181; *Horner* v. *United States,* 143 U. S. 576.

The Indiana statute constitutes an unlawful interference with and attempted regulation of interstate commerce. In so far as applicable to the subjects or commodities

of interstate commerce it is both regulatory and restrictive of that commerce. Its action and effect in this behalf is direct, as contradistinguished from indirect, in that by its terms it undertakes to impose as conditions precedent to the free and unrestricted enjoyment of the privileges of interstate commerce, the fulfillment of certain requirements. No State can impose conditions of this character. *Vance* v. *Vandercook*, 170 U. S. 438.

The power of the State is limited and measured by the constitutional inhibition against direct restriction or regulation of commerce amongst the several States. *Robbins* v. *Shelby District*, 120 U. S. 489; *West* v. *Kansas Gas Co.*, 221 U. S. 229.

It is no answer to say that the attempted exercise of such powers is referable to considerations appertaining to local police regulation and that their validity is attested by this circumstance. As applied to interstate commerce, the question still remains, whether, in the attempted exercise of otherwise concededly valid powers, that commerce has been directly regulated or restricted. *Asbell* v. *Kansas*, 209 U. S. 251, 254, 255; *Atlantic Coast Line* v. *Wharton*, 207 U. S. 328, 334; *Walling* v. *Michigan*, 116 U. S. 446; *Adams Express Co.* v. *Kentucky*, 214 U. S. 218; *Leisy* v. *Hardin*, 135 U. S. 100; *Crossman* v. *Lurman*, 192 U. S. 189; *Schollenberger* v. *Pennsylvania*, 171 U. S. 1.

While the act does not contain an express prohibition against importation and sale, prohibition is implied and its equivalent effected, by making compliance a condition to the right of importation and sale and visiting failure of compliance with criminal responsibility. If, under the guise of restricting the importation and sale of adulterated commodities, legislation may be adopted. restricting and limiting the right of importation and sale of all commodities and conditioning the exercise of that right upon such formalities as each State may see fit to impose, the results would be to bring within the police power any article of

consumption that a State might wish to exclude. *In re Rahrer*, 140 U. S. 545; *Bowman* v. *Chicago Ry.*, 125 U. S. 465; *Collins* v. *New Hampshire*, 171 U. S. 30.

The law in question is not an inspection act. The inspection features are evasions and the law itself primarily a revenue measure. The general powers of the States, with respect to the adoption of inspection laws, is referable to Art. I, § 10 of the Constitution. As originally interpreted, the power thus indicated was confined to foreign, as contradistinguished from interstate, commerce. *Turner* v. *Maryland*, 107 U. S. 38· *Woodruff* v. *Parham*, 8 Wall. 123, and cases cited.

Inspection laws act upon the subject before it becomes an article of foreign commerce or commerce among the States and prepare it for that commerce. *Gibbons* v. *Ogden*, 9 Wheat. 1; *Bowman* v. *Chicago Ry.*, *supra*.

As to the right of the States to adopt inspection laws with respect to personal property imported from abroad or from another State, see *Voight* v. *Wright*, 141 U. S. 62; *Patapsco Guano Co.* v. *North Carolina*, 171 U. S. 345; *Pabst Brew. Co.* v. *Crenshaw*, 198 U. S. 17.

Inspection which is virtually delegated to the foreign manufacturer who is required to file a verified analysis of his product, is not inspection at all. *Scott* v. *Donald*, 165 U. S. 58, 93, 99; *Vance* v. *Vandercook*, *supra*; and see dissenting opinion in *Pabst Brew. Co.* v. *Crenshaw*, *supra*.

In the ascertainment of the natural effect and intendment of the act this court is neither concluded by its self-styled objects nor its local interpretation. *Mugler* v. *Kansas*, 123 U. S. 623; *Railroad* v. *Husen*, 95 U. S. 465; *Reid* v. *Colorado*, 187 U. S. 137; *Asbell* v. *Kansas*, 209 U. S. 251.

The imposition of the tax must be rested upon the assumption that the act is a valid inspection act and the charge imposed with the bona fide purpose of defraying the cost of such inspection. Otherwise any such imposition

falls under the inhibition against taxation of interstate commerce. *Robbins* v. *Shelby District, supra; Postal Tel. Co.* v. *Taylor,* 192 U. S. 64; *Postal Tel. Co.* v. *New Hope,* 192 U. S. 55; *Atl. & Pac. Tel. Co.* v. *Philadelphia,* 190 U. S. 160; *McLain* v. *Denver Ry.,* 203 U. S. 38.

The act in question as applied to interstate commerce is superseded and annulled by the act of Congress of June 30, 1906, known as the Pure Food and Drug Act.

Where jurisdiction with respect to a subject-matter is vested in Congress by the Constitution, the laws of Congress, enacted in the exercise of the power thus delegated, constitute the supreme law of the land, and, of necessity, supersede and annul local legislation in the same field. *Chicago Ry.* v. *United States,* 219 U. S. 486; *Asbell* v. *Kansas,* 209 U. S. 251, 255.

The exclusive power as respects the regulation of interstate commerce is vested in Congress and the delegation of this authority to the Federal Government excludes its exercise by the States. This result obtains even in the absence of direct or affirmative legislation by Congress. *Bowman* v. *Chicago Ry., supra,* and cases cited; *Sturgis* v. *Crowninshield,* 4 Wheat. 122; *Reid* v. *Colorado,* 187 U. S. 137.

Legislation of the character of that presented by the Indiana law, contravening as it does the provisions of the Federal enactment, must be held null and void.

*Mr. Edwin Corr,* with whom *Mr. Thomas M. Honan,* Attorney General of the State of Indiana, was on the brief, for appellee:

Appellant shows by his bill that he cannot be injured, except incidentally, by the operation of this law. It must appear that the law operates upon him or his property directly and not incidentally. *Southern Ry.* v. *King,* 217 U. S. 534; *Hatch* v. *Reardon,* 204 U. S. 160; *Hooker* v. *Burr,* 194 U. S. 419.

The class to whom protection is guaranteed by that provision of the Constitution giving Congress the right to regulate commerce among the several States, is necessarily the class who engage in interstate commerce. Unless a person belongs to that class he would have no interest in a law regulating such commerce and would have no right to attack a state law undertaking to regulate interstate commerce on the ground of its unconstitutionality. Appellant has not engaged in and does not engage in interstate commerce.

In determining the validity of this law, it should be considered in its entire scope, and not in detached paragraphs. It should be considered as a whole. Thus considered it will be seen to be a valid exercise of the police power, which is reserved to the States. The act is simply an inspection law designed to protect the public against the sale of adulterated concentrated commercial feeding stuff. It does not directly undertake to regulate interstate commerce. It does not undertake the regulation of importation of commodities into the State. It is only where the police power of a state law undertakes directly to regulate interstate commerce that it is invalid. *McLean* v. *Denver & R. G. R. Co.*, 203 U. S. 50.

The grant to Congress of authority to regulate foreign and interstate commerce did not involve a surrender by the States of their police powers. *Plumley* v. *Massachusetts*, 155 U. S. 471; *In re Rahrer*, 140 U. S. 545, 546.

In exercising its right to protect persons and property within its borders, a State has a right to require that any article of commerce, whether harmful or not, be sold for just what it is, and may require it to be labeled showing of what it is composed. In its regulations to prevent fraud and deceit and adulteration in the sale of articles, it may require an inspection not only of adulterated articles but of those which may not be adulterated. Inspection laws are not founded on the theory that the things on which

they act are dangerous or noxious in themselves. *Bowman v. Chicago Ry. Co.*, 125 U. S. 488; *Heath & Milligan v. Worst*, 207 U. S. 338; *Stilz v. Thompson*, 44 Minnesota, 271; *Patapsco Guano Co. v. North Carolina*, 171 U. S. 345.

The Indiana law does not require the manufacturer or vendor of concentrated commercial feeding stuff to disclose any of his secret formulas. It only requires him to state the ingredients that enter into its composition. See *Arbuckle v. Blackburn*, 113 Fed. Rep. 616–627, aff'd 191 U. S. 405.

Unless the inspection fee is so unreasonably large as to show on its face the lack of good faith in the enactment of the law, the question of the amount of such inspection fee is a legislative and not a judicial question. *McLean v. Denver & R. G. R. Co.*, 203 U. S. 55; *Patapsco Guano Co. v. North Carolina*, 171 U. S. 355; *Neilson v. Garza*, 2 Woods, 287.

The Indiana law is supplemental or complemental to the Federal Pure Food and Drug Act and does not in any way conflict therewith. *Crossman v. Lurman*, 192 U. S. 190.

Appellant is not entitled to equitable relief upon the allegations of his bill. *Francis v. Flinn*, 118 U. S. 388; *Arbuckle v. Blackburn, supra.*

The contention that the standard by which the constituents of commercial feeding stuffs is to be determined is indefinite and might vary, even if conceded, would not affect the validity of this law, for it only goes to the defect or incompleteness of the legislation, not to its legality. *Heath & Milligan v. Worst*, 207 U. S. 358. Inaccuracies in a law may be removed in the administration of the same or by legislative modification.

Appellant does not come into court with clean hands. He gives his product a false name. He calls that a food which he says is a medicine. His product is misbranded and he is not entitled to the aid of a court of equity.

MR. JUSTICE HUGHES, after making the above statement, delivered the opinion of the court.

The principal contention in support of this appeal is that the statute of Indiana (Acts 1907, chapter 206), the provisions of which have been set forth, is an unconstitutional interference with the complainant's right to engage in interstate commerce.

A preliminary question arises with respect to the jurisdiction of this court, by reason of the allegation of the bill that the complainant's product is not a "concentrated commercial feeding stuff" within the true meaning of the act, and that so interpreted the statute would not apply. But it was also alleged that the State Chemist, who was authorized to enforce the statute, had construed it to be applicable to the commodity, which is commercially known as "International Stock Food;" and thus charged by the officer with the duty of obedience, the complainant in his bill challenged the constitutionality of the legislation. The grounds for the attack were not found in the conclusions reached by the officer, as to the nature of the article, in administering an act otherwise conceded to be valid (*Arbuckle* v. *Blackburn*, 191 U. S. 405, 414), but in the provisions of the statute itself as applied to the articles within its purview while in the course of interstate commerce. A general demurrer, for want of equity, was sustained, and in view of the substantial character of the contention the case must be regarded as one in which the law of a State is claimed to be in contravention of the Constitution of the United States. Act of March 3, 1891, 26 Stat. 826, c. 517, § 5; *Penn Mutual Life Insurance Co.* v. *Austin*, 168 U. S. 685, 694; *Loeb* v. *Columbia Township Trustees*, 179 U. S. 472, 478; *Lampasas* v. *Bell*, 180 U. S. 276, 282.

It is said that the complainant is not entitled to invoke the constitutional protection, in that he fails to show in-

jury. *Southern Railway Co.* v. *King*, 217 U. S. 524, 534.
The argument rests upon the averment in the bill that his
sales were made at Minneapolis, the goods "to be delivered
free on board of cars" at that point, "and delivered to
purchasers and consumers within the State of Indiana in
the original unbroken packages, freight being paid thereon
by the consumers and purchasers." In answer, it must
again be said that "commerce among the States is not a
technical legal conception, but a practical one, drawn
from the course of business." *Swift & Co.* v. *United
States*, 196 U. S. 375, 398; *Rearick* v. *Pennsylvania*, 203
U. S. 507, 512. It clearly appears from the bill that the
complainant was engaged in dealing with purchasers in
another State. His product manufactured in Minnesota
was, in pursuance of his contracts of sale, to be delivered
to carriers for transportation to the purchasers in Indiana.
This was interstate commerce, in the freedom of which
from any unconstitutional burden the complainant had a
direct interest. The protection accorded to this com-
merce by the Federal Constitution extended to the sale
by the receiver of the goods in the original packages.
*Leisy* v. *Hardin*, 135 U. S. 100; *In re Rahrer*, 140 U. S. 545,
559, 560; *Plumley* v. *Massachusetts*, 155 U. S. 461, 473;
*Vance* v. *Vandercook Co.* (No. 1), 170 U. S. 438, 444, 445;
*Schollenberger* v. *Pennsylvania*, 171 U. S. 1, 22–25; *Hey-
man* v. *Southern Railway Co.*, 203 U. S. 270, 276. An at-
tack upon this right of the importing purchasers to sell in
the original packages bought from the complainant, not
only would be to their prejudice, but inevitably would
inflict injury upon the complainant by reducing his in-
terstate sales, a result to be avoided only through his
compliance with the act by filing the statement and affix-
ing to his goods the labels it required. According to the
bill, the State Chemist had threatened the complainant
that in default of such compliance he would cause the
arrest and prosecution of every person dealing in the

article within the State and had distributed broadcast throughout the State warning circulars. If the statute of Indiana, as applied to sales by importing purchasers in the original packages, constitutes an unwarrantable interference with interstate commerce in the complainant's product, he had standing to complain, and was entitled to relief against enforcement by the defendant of the illegal demands. *Scott* v. *Donald,* 165 U. S. 107, 112; *Ex parte Young,* 209 U. S. 123, 159, 160; *Ludwig* v. *Western Union Telegraph Co.,* 216 U. S. 146; *Hopkins* v. *Clemson College,* 221 U. S. 636, 643–645; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 620, 621.

We are thus brought to the examination of the statute. The question of its constitutional validity may be considered in two aspects, (1) independently of the operation and effect of the act of Congress of June 30, 1906, c. 3915 (34 Stat. 768), known as "The Food and Drugs Act," and (2) in the light of this Federal enactment.

*First.* The statute relates to the sale of various sorts of food, for domestic animals, embraced in the term "concentrated commercial feeding stuff" as defined in the act. It requires the filing of a statement and a sworn certificate, the affixing of a label bearing certain information, and a stamp.

By § 1 it is provided, in substance, that before any such feeding stuff is sold, or offered for sale, in Indiana, "the manufacturer, importer, dealer, agent or person," selling or offering it, shall file with the State Chemist a statement that he desires to sell the feeding stuff, and also a sworn certificate, for registration, stating (a) the name of the manufacturer, (b) the location of the principal office of the manufacturer, (c) the name, brand or trade-mark under which the article will be sold, (d) the ingredients from which it is compounded, and (e) the minimum percentage of crude fat and crude protein, allowing one per cent. of nitrogen to equal six and twenty-five hundredths

per cent. of protein, and the maximum percentage of crude
fiber which the manufacturer or person offering the article
for sale guarantees it to contain; these constituents to be
determined by the methods recommended by the associa-
tion. of official agricultural chemists of the United States.
The State Chemist is to register the facts set forth in the
certificate in a permanent record (§ 3).

Section 2 provides that there shall be affixed to every
package or sample of the article a tag or label which shall
be accepted as a guarantee of the manufacturer, im-
porter, dealer or agent and shall have plainly printed
thereon (a) the number of net pounds of feeding stuff in
the package, (b) the name, brand or trade-mark under
which it is sold, (c) the name of the manufacturer, (d) the
location of the principal office of the manufacturer, and
(e) the guaranteed analysis stating the minimum percent-
age of crude fat and crude protein determined as described
in § 1, and the ingredients from which the article is com-
pounded.

A stamp purchased from the State Chemist, showing
that the article has been registered and that the inspection
tax has been paid, is to be affixed for each one hundred
pounds or fraction thereof, special provision being made
for the delivery of an equivalent number of stamps on sale
in bulk.   By an amendment of 1909, stamps are to be is-
sued by the State Chemist to cover twenty-five, fifty and
one hundred pounds (Acts 1909, chapter 46, p. 106).   He
is not required to sell stamps in less amount than to the
value of five dollars, or multiples thereof, for any one feed-
ing stuff, or to register any certificate unless accompanied
by an order and fees for stamps to the amount of five dol-
lars, or some multiple of that sum (§ 3).   Sworn statements
are to be filed annually of the number of net pounds of
each brand of feeding stuff sold or offered for sale in the
State (§ 4).

The price of the stamps under the original act was one

dollar per hundred; but by the amendment of 1909 (*supra*) the charge was made eighty cents per hundred, for stamps to cover one hundred pounds, and forty cents and twenty cents respectively for stamps to cover fifty and twenty-five' pounds. The fees received are to be paid into the treasury of the Indiana Agricultural Experiment Station and expended "in meeting all necessary expenses in carrying out the provisions of this act, including the employment of inspectors, chemists, expenses in procuring samples, printing bulletins giving the results of the work of feeding stuff inspection, as provided for by this act, and for any other expenses of said Indiana agricultural experiment station, as authorized by law." A classified report of the receipts and expenditures is to be made to the Governor of the State annually (§ 5).

Any one selling, or offering for sale, any feeding stuff which has not been registered, and labeled and stamped as required by the act, or which is found by an analysis made by the State Chemist or under his direction to contain "a smaller percentage of crude fat or crude protein than the minimum guarantee," or is "labelled with a false or inaccurate guarantee," and any one who adulterates any feeding stuff "with foreign mineral matter or other foreign substance, such as rice hulls, chaff, mill sweepings," etc., "or other materials of less or of little or no feeding value without plainly stating on the label hereinbefore described, the kind and amount of such mixture," or who adulterates with any substance injurious to the health of domestic animals, or alters the State Chemist's stamp, or uses it a second time, or fails to make the sworn statement as to annual sales as required, is guilty of a misdemeanor and is subject to fine (§ 6).

The State Chemist and his deputies are empowered to procure from any lot or package of the described feeding stuffs offered for sale or found in Indiana a quantity not exceeding two pounds, to be drawn during reasonable

business hours, or in the presence of the owner or his representatives (§ 7), and it is made a misdemeanor to interfere with such inspection and sampling (§ 8). He is also authorized to prescribe and enforce regulations as he may deem necessary to carry the act into effect; and he may refuse "the registration of any feeding stuff under a name which would be misleading as to the materials of which it is made, or when the percentage of crude fiber is above or the percentage of crude fat or crude protein below the standards adopted for concentrated commercial feeding stuffs."

The evident purpose of the statute is to prevent fraud and imposition in the sale of food for domestic animals, a matter of great importance to the people of the State. Its requirements were directed to that end, and they were not unreasonable. It was not aimed at interstate commerce, but without discrimination sought to promote fair dealing in the described articles of food. The practice of selling feeding stuffs under general descriptions gave opportunity for abuses which the legislature of Indiana determined to correct, and to safeguard against deception it required a disclosure of the ingredients contained in the composition. The bill complains of the injury to manufacturers if they are forced to reveal their secret formulas and processes. We need not here express an opinion upon this question, in the breadth suggested, as the statute does not compel a disclosure of formulas or manner of combination. It does demand a statement of the ingredients, and also of the minimum percentage of crude fat and crude protein and of the maximum percentage of crude fiber, a requirement of obvious propriety in connection with substances purveyed as feeding stuffs.

The State cannot, under cover of exerting its police powers, undertake what amounts essentially to a regulation of interstate commerce, or impose a direct burden upon that commerce. *Railroad Co.* v. *Husen*, 95 U. S.

465, 475; *Walling* v. *Michigan*, 116 U. S. 446; *Bowman* v. *Chicago &c. Ry. Co.*, 125 U. S. 465; *Leisy* v. *Hardin*, 135 U. S. 100; *Minnesota* v. *Barber*, 136 U. S. 313; *Brimmer* v. *Rebman*, 138 U. S. 78; *Scott* v. *Donald*, 165 U. S. 58; *Schollenberger* v. *Pennsylvania*, 171 U. S. 1, 13; *Houston & Texas Central R. R. Co.* v. *Mayes*, 201 U. S. 321; *Atlantic Coast Line* v. *Wharton*, 207 U. S. 328; *Adams Express Co.* v. *Kentucky*, 214 U. S. 218. But when the local police regulation has real relation to the suitable protection of the people of the State, and is reasonable in its requirements, it is not invalid because it may incidentally affect interstate commerce, provided it does not conflict with legislation enacted by Congress pursuant to its constitutional authority. *Plumley* v. *Massachusetts*, 155 U. S. 461; *Hennington* v. *Georgia*, 163 U. S. 299, 317; *N. Y., N. H. & H. Ry. Co.* v. *New York*, 165 U. S. 628; *Chicago, M. & St. P. Ry. Co.* v. *Solan*, 169 U. S. 133; *Missouri, Kansas & Texas Ry. Co.* v. *Haber*, 169 U. S. 613; *Patapsco Guano Co.* v. *North Carolina*, 171 U. S. 345; *Reid* v. *Colorado*, 187 U. S. 137; *Pennsylvania R. R. Co.* v. *Hughes*, 191 U. S. 477; *Crossman* v. *Lurman*, 192 U. S. 189; *McLean* v. *Denver & Rio Grande R. R. Co.*, 203 U. S. 38, 50; *Asbell* v. *Kansas*, 209 U. S. 251, 254–256; *Chicago, R. I. & P. Ry. Co.* v. *Arkansas*, 219 U. S. 453.

In *Plumley* v. *Massachusetts*, a law of that Commonwealth was sustained which had been passed "to prevent deception in the manufacture and sale of imitation butter." The article, for the sale of which the plaintiff in error was convicted in the state court, had been received by him from the manufacturers in Illinois, as their agent, and had been sold in Massachusetts in the original package. The court said (*supra*, pp. 468, 472), referring to the purpose and effect of the statute: "He is only forbidden to practise, in such matters, a fraud upon the general public. The statute seeks to suppress false pretences and to promote fair dealing in the sale of an article of food. It

compels the sale of oleomargarine for what it really is, by preventing its sale for what it is not. Can it be that the Constitution of the United States secures to any one the privilege of manufacturing and selling an article of food in such manner as to induce the mass of people to believe that they are buying something which, in fact, is wholly different from that which is offered for sale? Does the freedom of commerce among the States demand a recognition of the right to practice a deception upon the public in the sale of any articles, even those that may have become the subject of trade in different parts of the country? . . . Such legislation may, indeed, indirectly or incidentally affect trade in such products transported from one State to another State. But that circumstance does not show that laws of the character alluded to are inconsistent with the power of Congress to regulate commerce among the States."

In *Patapsco Guano Co.* v. *North Carolina, supra,* the court had before it a statute of North Carolina relating to fertilizing materials. It provided: "Every bag, barrel or other package of such fertilizers or fertilizing materials as above designated offered for sale in this State shall have thereon plainly printed a label or stamp, a copy of which shall be filed with the Commissioner of Agriculture, together with a true and faithful sample of the fertilizer or fertilizing material which it is proposed to sell, . . . and the said label or stamp shall truly set forth the name, location and trade-mark of the manufacturer; also the chemical composition of the contents of such package, and the real percentage of any of the following ingredients asserted to be present, to wit, soluble and precipitated phosphoric acid, which shall not be less than eight per cent; soluble potassa, which shall not be less than one per cent; ammonia, which shall not be less than two per cent, or its equivalent in nitrogen; together with the date of its analyzation, and that the requirements of the law have

been complied with; and any such fertilizer as shall be ascertained by analysis not to contain the ingredients and percentage set forth as above provided shall be liable to seizure and condemnation." A charge of twenty-five cents per ton on such materials was laid for the purpose of defraying the expenses connected with the inspection; and the department of agriculture was authorized to establish an experiment station and to employ an analyst, whose duty it was to analyze such fertilizers and products as might be required by the department and to aid so far as practicable in suppressing fraud in their sale.

The court upheld the statute, saying (*supra*, p. 357): "Whenever inspection laws act on the subject before it becomes an article of commerce they are confessedly valid, and also when, although operating on articles brought from one State into another, they provide for inspection in the exercise of that power of self-protection commonly called the police power." After referring to the decision in *Plumley* v. *Massachusetts, supra,* the court continued (pp. 358, 361): "Where the subject is of wide importance to the community, the consequences of fraudulent practices generally injurious, and the suppression of such frauds matter of public concern, it is within the protective power of the State to intervene. Laws providing for the inspection and grading of flour, the inspection and regulation of weights and measures, the weighing of coal on public scales, and the like, are all competent exercises of that power, and it is not perceived why the prevention of deception in the adulteration of fertilizers does not fall within its scope. . . . The act of January 21, 1891, must be regarded, then, as an act providing for the inspection of fertilizers and fertilizing materials in order to prevent the practice of imposition on the people of the State, and the charge of twenty-five cents per ton as intended merely to defray the cost of such inspection. It being competent for the State to pass laws of this character, does the re-

quirement of inspection and payment of its cost bring the act into collision with the commercial power vested in Congress? Clearly this cannot be so as to foreign commerce, for clause two of section ten of article one expressly recognizes the validity of state inspection laws, and allows the collection of the amounts necessary for their execution; and we think the same principle must apply to interstate commerce. In any view, the effect on that commerce is indirect and incidental, and 'the Constitution of the United States does not secure to any one the privilege of defrauding the public.'"

It cannot be doubted that, within the principle of these decisions, and of the others above cited, the State of Indiana—assuming for the present that there was no conflict with Federal legislation—was entitled, in the exercise of its police power, to require the disclosure of the ingredients contained in the feeding stuffs offered for sale in the State, and to provide for their inspection and analysis. The provisions for the filing of a certificate, for registration and for labels, were merely incidental to these requirements and were appropriate means for accomplishing the legitimate purpose of the act. It is said that the statute permits the State, through its officials, to set up arbitrary standards governing conditions of manufacture. But it does not appear that any arbitrary standard has been set up, or that there has been any attempt to enforce one against the complainant. (See *Western Union Telegraph Co.* v. *Richmond*, 224 U. S. 160, 168.) The complainant has declined to file the statement and to affix the labels containing the disclosure of ingredients for which the statute provides, and instead he resorts to this suit.

The contention is made that the statute is a disguised revenue measure, but on a review of its provisions we find no warrant for such a characterization of it. The bill sets forth no facts whatever to show that the charge for stamps is unreasonable in its relation to the cost of inspec-

tion, and certainly it cannot be said that aught appears "to justify the imputation of bad faith and change the character of the act." *Patapsco Guano Co.* v. *North Carolina, supra; McLean* v. *Denver & Rio Grande R. R. Co., supra; Red "C" Oil Co.* v. *North Carolina,* 222 U. S. 380, 393. With respect to the requirement of an advance payment for stamps, to the value of five dollars, to accompany the certificate, we need not say more than that the complainant is plainly not prejudiced, in view of the alleged extent of his sales.

Second. The question remains whether the statute of Indiana is in conflict with the act of Congress known as the Food and Drugs Act of June 30, 1906 (34 Stat. 768, c. 3915). For the former, so far as it affects interstate commerce even indirectly and incidentally, can have no validity if repugnant to the Federal regulation. *Reid* v. *Colorado,* 187 U. S. 137, 146, 147; *Asbell* v. *Kansas,* 209 U. S. 251, 256, 257; *Northern Pacific Ry. Co.* v. *Washington,* 222 U. S. 370, 378; *Southern Ry. Co.* v. *Reid,* 222 U. S. 424, 436.

The object of the Food and Drugs Act is to prevent adulteration and misbranding, as therein defined. It prohibits the introduction into any State from any other State "of any article of food or drugs which is adulterated or misbranded, within the meaning of this act." The purpose is to keep such articles "out of the channels of interstate commerce, or, if they enter such commerce, to condemn them while being transported or when they have reached their destinations, provided they remain unloaded, unsold or in original unbroken packages." *Hipolite Egg Co.* v. *United States,* 220 U. S. 45, 54. To determine the scope of the act with respect to feeding stuffs we must examine its definitions of the adulteration and misbranding of food, the term "food" including "all articles used for food, drink, confectionery, or condiment by man or other animals, whether simple, mixed or com-

pound " (§ 6). These definitions are found in §§ 7 and 8, which are set forth in the margin.[1]

---

[1] SEC. 7. That for the purposes of this Act an article shall be deemed to be adulterated: . . .

In the case of food:

First. If any substance has been mixed and packed with it so as to reduce or lower or injuriously affect its quality or strength.

Second. If any substance has been substituted wholly or in part for the article.

Third. If any valuable constituent of the article has been wholly or in part abstracted.

Fourth. If it be mixed, colored, powdered, coated, or stained in a manner whereby damage or inferiority is concealed.

Fifth. If it contain any added poisonous or other added deleterious ingredient which may render such article injurious to health: *Provided,* That when in the preparation of food products for shipment they are preserved by any external application applied in such manner that the preservative is necessarily removed mechanically, or by maceration in water, or otherwise, and directions for the removal of such preservative shall be printed on the covering or the package, the provisions of this Act shall be construed as applying only when said products are ready for consumption.

Sixth. If it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter.

SEC. 8. That the term "misbranded," as used herein, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device regarding such article, or the ingredients or substances contained therein which shall be false or misleading in any particular, and to any food or drug product which is falsely branded as to the State, Territory, or country in which it is manufactured or produced.

That for the purposes of this Act an article shall also be deemed to be misbranded: . . .

In the case of food:

First. If it be an imitation of or offered for sale under the distinctive name of another article.

Second. If it be labeled or branded so as to deceive or mislead the purchaser, or purport to be a foreign product when not so, or if the contents of the package as originally put up shall have been removed in

It will be observed that in its enumeration of the acts, which constitute a violation of the statute, Congress has not included the failure to disclose the ingredients of the article, save in specific instances where, for example, morphine, opium, cocaine, or other substances particularly mentioned, are present. It is provided that the article "for the purposes of this Act" shall be deemed to be misbranded if the package or label bear any state-

whole or in part and other contents shall have been placed in such package, or if it fail to bear a statement on the label of the quantity or proportion of any morphine, opium, cocaine, heroin, alpha or beta eucane, chloroform, cannabis indica, chloral hydrate, or acetanilide, or any derivative or preparation of any of such substances contained therein.

Third. If in package form, and the contents are stated in terms of weight or measure, they are not plainly and correctly stated on the outside of the package.

Fourth. If the package containing it or its label shall bear any statement, design, or device regarding the ingredients or the substances contained therein, which statement, design, or device shall be false or misleading in any particular: *Provided*, That an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be adulterated or misbranded in the following cases:

First. In the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food, under their own distinctive names, and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced.

Second. In the case of articles labeled, branded, or tagged so as to plainly indicate that they are compounds, imitations, or blends, and the word "compound," "imitation," or "blend," as the case may be, is plainly stated on the package in which it is offered for sale: *Provided*, That the term blend as used herein shall be construed to mean a mixture of like substances, not excluding harmless coloring or flavoring ingredients used for the purpose of coloring and flavoring only: *And provided further*, That nothing in this Act shall be construed as requiring or compelling proprietors or manufacturers of proprietary foods which contain no unwholesome added ingredient to disclose their trade formulas, except in so far as the provisions of this Act may require to secure freedom from adulteration or misbranding.

ment, design or device regarding it or the ingredients or substances it contains, which shall be false or misleading (§ 8). But this does not cover the entire ground. It is one thing to make a false or misleading statement regarding the article or its ingredients, and it may be quite another to give no information as to what the ingredients are. As is well known, products may be sold, and in case of so-called proprietary articles frequently are sold, under trade names which do not reveal the ingredients of the composition and the proprietors refrain from revealing them. Moreover, in defining what shall be adulteration or misbranding for the purposes of the Federal act, it is provided that mixtures or compounds known as articles of food under their own distinctive names, not taking or imitating the distinctive name of another article, which do not contain "any added poisonous or deleterious ingredients" shall not be deemed to be adulterated or misbranded if the name be accompanied on the same label or brand with a statement of the place of manufacture (§ 8).

Congress has thus limited the scope of its prohibitions. It has not included that at which the Indiana statute aims. Can it be said that Congress, nevertheless, has denied to the State, with respect to the feeding stuffs coming from another State and sold in the original packages, the power the State otherwise would have to prevent imposition upon the public by making a reasonable and non-discriminatory provision for the disclosure of ingredients, and for inspection and analysis? If there be such denial it is not to be found in any express declaration to that effect. Undoubtedly Congress, by virtue of its paramount authority over interstate commerce, might have said that such goods should be free from the incidental effect of a state law enacted for these purposes. But it did not so declare. There is a proviso in the section defining misbranding for the purposes of the act that "nothing in this Act shall be construed" as requiring manufacturers of

proprietary foods which contain no unwholesome added ingredient to disclose their trade formulas "except in so far as the provisions of this Act may require to secure freedom from adulteration or misbranding" (§ 8). We have already noted the limitations of the provisions referred to. And it is clear that this proviso merely relates to the interpretation of the requirements of the act, and does not enlarge its purview or establish a rule as to matters which lie outside its prohibitions.

Is, then, a denial to the State of the exercise of its power for the purposes in question necessarily implied in the Federal statute? For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power. *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426; *Northern Pacific Ry. Co.* v. *Washington, supra; Southern Ry. Co.* v. *Reid, supra.*

But the intent to supersede the exercise by the State of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the State. This principle has had abundant illustration. *Chicago &c. Ry. Co.* v. *Solan*, 169 U. S. 133; *Missouri, Kansas & Texas Ry. Co.* v. *Haber*, 169 U. S. 613; *Reid* v. *Colorado*, 187 U. S. 137; *Pennsylvania R. R. Co.* v. *Hughes*, 191 U. S. 477; *Crossman* v. *Lurman*, 192 U. S. 189; *Asbell* v. *Kansas*, 209 U. S. 251; *Northern Pacific Ry. Co.* v. *Washington*, 222

U. S. 370, 379; *Southern Ry. Co.* v. *Reid,* 222 U. S. 424, 442.

In *Missouri, Kansas & Texas Ry. Co.* v. *Haber, supra,* the Supreme Court of Kansas had affirmed a judgment against the railway company for damages caused by its having brought into the State certain cattle alleged to have been affected with Texas fever which was communicated to the cattle of the plaintiff. The recovery was based upon a statute of Kansas which made actionable the driving or transporting into the State of cattle which were liable to communicate the fever. It was contended that the act of Congress of May 29, 1884, c. 60 (23 Stat. 31), known as the Animal Industry Act, together with the act of March 3, 1891, c. 544 (26 Stat. 1044), appropriating money to carry out its provisions, and § 5258 of the Revised Statutes, covered substantially the whole subject of the transportation from one State to another State of live stock capable of imparting contagious disease, and therefore that the State of Kansas had no authority to deal in any form with that subject. The act of 1884 provided for the establishment of a bureau of animal industry, for the appointment of a staff to investigate the condition of domestic animals and for report upon the means to be adopted to guard against the spread of disease. Regulations were to be prepared by the commissioner of agriculture and certified to the executive authority of each State and Territory. Special investigation was to be made for the protection of foreign commerce and the Secretary of the Treasury was to establish such regulations as might be required concerning exportation. It was provided that no railroad company within the United States, nor the owners or masters of any vessel should receive for transportation, or transport, from one State to another any live stock affected with any communicable disease, nor should any one deliver for such transportation, or drive on foot or transport in private conveyance from

one State to another any live stock knowing them to be so affected. It was made the duty of the commissioner of agriculture to notify the proper officials or agents of transportation companies doing business in any infected locality of the existence of contagion; and the operators of railroads, or the owners or custodians of live stock within such infected district, who should knowingly violate the provisions of the act were to be guilty of a misdemeanor punishable by fine or imprisonment.

The court held that this Federal legislation did not override the statute of the State; that the latter created a civil liability as to which the Animal Industry Act of Congress had not made provision. The court said (*supra*, pp. 623, 624):

"May not these statutory provisions stand without obstructing or embarrassing the execution of the act of Congress? This question must of course be determined with reference to the settled rule that a statute enacted in execution of a reserved power of the State is not to be regarded as inconsistent with an act of Congress passed in the execution of a clear power under the Constitution, unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or stand together. *Sinnot* v. *Davenport,* 22 How. 227, 243. . . . Whether a corporation transporting, or the person causing to be transported from one State to another cattle of the class specified in the Kansas statute, should be liable in a civil action for any damages sustained by the owners of domestic cattle by reason of the introduction into their State of such diseased cattle, is a subject about which the Animal Industry Act did not make any provision. That act does not declare that the regulations established by the Department of Agriculture should have the effect to exempt from civil liability one who, but for such regulations, would have been liable either under the general principles of law or under some state enactment for damages arising

out of the introduction into that State of cattle so af-
fected. And, as will be seen from the regulations pre-
scribed by the Secretary of Agriculture, that officer did
not assume to give protection to any one against such
liability."

In *Reid* v. *Colorado, supra,* the question arose under a
statute of Colorado which had been passed to prevent the
introduction into the State of diseased animals. The
statute made it a misdemeanor for any one to bring into
the State between April 1 and November 1 any cattle or
horses from a State, Territory or county south of the
36th parallel of north latitude, unless they had been held
at some place north of that parallel at least ninety days
prior to importation, or unless the owner or person in
charge should procure from the State Veterinary Sanitary
Board a certificate, or bill of health, to the effect that the
cattle or horses were free from all infectious or contagious
diseases and had not been exposed thereto at any time
within the preceding ninety days. The expense of any in-
spection in connection therewith was to be paid by the
owner.

The plaintiff in error had been convicted of bringing
cattle into the State in violation of the statute. There
was no proof in the case that the particular cattle had any
infectious or contagious disease, but it did appear that
they were brought from Texas, south of the 36th parallel,
without being held or inspected as the statute required.
Its provisions were ignored altogether as invalid legisla-
tion. When the plaintiff in error refused assent to the
state inspection he showed to the authorities a certificate
signed by an assistant inspector of the Federal bureau of
animal industry who certified that he had carefully in-
spected the cattle in Texas and found them free from
communicable disease. It was insisted that the statute
of Colorado was in conflict with the Animal Industry Act
of Congress, but the court sustained the state law for the

reason that, although the two statutes related to the same general subject, they did not cover the same ground and were not inconsistent with each other.

The court thus emphasized the general principle involved (*supra*, p. 148): "It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the States, even when it may do so, unless its purpose to effect that result is clearly manifested. This court has said—and the principle has been often reaffirmed—that 'in the application of this principle of supremacy of an act of Congress in a case where the state law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together.'" And in the course of its review of the subjects embraced in the Federal legislation the court said (pp. 149, 150):

"Still another subject covered by the act is the driving on foot or transporting from one State or Territory into another State or Territory, or from any State into the District of Columbia, or from the District into any State, of any live stock *known* to be affected with any contagious, infectious or communicable disease. But this provision does not cover the entire subject of the transporting or shipping of diseased live stock from one State to another. The owner of such stock, when bringing them into another State, may not know them to be diseased; but they may, in fact, be diseased, or the circumstances may be such as fairly to authorize the State into which they are about to be brought to take such precautionary measures as will reasonably guard its own domestic animals against danger from contagious, infectious or communicable diseases. The act of Congress left the State free to cover that field by such regulations as it deemed appropriate, and which only incidentally affected the freedom of interstate commerce. Congress went no farther than to make it an

offence against the United States for any one *knowingly* to take or send from one State or Territory to another State or Territory, or into the District of Columbia, or from the District into any State, live stock affected with infectious or communicable disease.    The Animal Industry Act did not make it an offence against the United States to send from one State into another live stock which the shipper did not know were diseased.    The offence charged upon the defendant in the state court was not the introduction into Colorado of cattle that he knew to be diseased.    He was charged with having brought his cattle into Colorado from certain counties in Texas, south of the 36th parallel of north latitude, without said cattle having been held at some place north of said parallel of latitude for at least the time required prior to their being brought into Colorado, and without having procured from the State Veterinary Sanitary Board a certificate or bill of health to the effect that his cattle—in fact—were free from all infectious or contagious diseases, and had not been exposed at any time within ninety days prior thereto to any such diseases, but had declined to procure such certificate or have the inspection required by the statute.    His knowledge as to the actual condition of the cattle was of no consequence under the state enactment or under the charge made.

   " Our conclusion is that the statute of Colorado as here involved does not cover the same ground as the act of Congress and therefore is not inconsistent with that act; and its constitutionality is not to be questioned unless it be in violation of the Constitution of the United States, independently of any legislation by Congress."

   In *Asbell* v. *Kansas, supra,* the plaintiff in error had been convicted under a statute of the State of Kansas which made it a misdemeanor to transport cattle into the State from any point south of the south line of the State, except for immediate slaughter, without having first

caused them to be inspected and passed as healthy by the proper state officials or by the bureau of animal industry of the Interior Department of the United States. The court held that the statute was a valid exercise of the power of the State unless it were in conflict with the act of Congress. It appeared that since the decision in *Reid* v. *Colorado, supra,* Congress had provided that where an inspector of the bureau of animal industry had issued a certificate that he had inspected live stock and found them free from communicable disease they should be transported into any State or Territory without further inspection or the exaction of fees of any kind, except such as might be required by the Secretary of Agriculture. But as the law of Kansas recognized the Federal certificate, a conflict with the act of Congress was avoided, and hence the conviction under the state law was sustained.

Applying these established principles to the present case, no ground appears for denying validity to the statute of Indiana. That State has determined that it is necessary in order to secure proper protection from deception that purchasers of the described feeding stuffs should be suitably informed of what they are buying and has made reasonable provision for disclosure of ingredients by certificate and label, and for inspection and analysis. The requirements, the enforcement of which the bill seeks to enjoin, are not in any way in conflict with the provisions of the Federal act. They may be sustained without impairing in the slightest degree its operation and effect. There is no question here of conflicting standards, or of opposition of state to Federal authority. It follows that the complainant's bill in this aspect of the case was without equity.

Other objections urged by the bill to the validity of the statute, save so far as they may be deemed to involve the questions that have already been considered, have not been pressed in argument and need not be discussed.

Recurring to the contention that the product of the complainant is not within the statute, it is evident that, assuming the validity of the enactment, the complainant showed no ground for resorting to equity, as the nature of the composition must be determined according to the fact in the course of due proceedings for that purpose.

The demurrer was properly sustained.

*Affirmed.*