UNITED STATES v. FORTY BARRELS AND TWENTY KEGS OF COCA COLA.

(Circuit Court of Appeals, Sixth Circuit. June 13, 1914.)

No. 2415.

1. STATUTES (§ 184*)—CONSTRUCTION—LEGISLATIVE INTENT.

In applying a statute to particular facts, and when it becomes necessary to construe language to which the parties give different meanings, the court have in mind the essential scope and purpose of the act.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 262; Dec. Dig. § 184.*]

2. FOOD (§ 2*)—FOOD AND DRUGS ACT—CONSTRUCTION—PURPOSE.

The purpose of the Food and Drugs Act (Act June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1911, p. 1354]), entitled, "An act for preventing the manufacture, sale or transportation of adulterated or misbranded or poisonous or deleterious foods," etc., and prohibiting interstate commerce in any article which is adulterated or misbranded, defining an article deemed to be adulterated or misbranded, providing for the seizure and forfeiture of offending articles, and prohibiting importations from foreign countries of food adulterated or misbranded or otherwise dangerous to the health of the people, is to prevent fraud and deception, so that a purchaser can obtain the thing he supposes he is obtaining, rather than the protection of the public health to the extent of preventing a purchaser from deliberately and intentionally buying a particular food which is what it purports to be, though a jury may think it deleterious.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 2; Dec. Dig. § 2.*]

3. FOOD (§ 5*)—FOOD AND DRUGS ACT—CONSTRUCTION—"ADDED."

The word "added" in Food and Drugs Act, § 7, declaring that an article shall be deemed to be adulterated if it contain any added poisonous or other added deleterious ingredient which may render the article injurious to health, implies the existence of a standard, and an element necessarily used to create a standard is not "added," and caffeine, forming a valuable constituent of Coca Cola, made up of water, sugar, caffeine, phosphoric acid, glycerine, lime juice, coloring, and flavoring matter, is not "added," where for 15 years before the act the article containing all the ingredients had been widely used.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*
For other definitions, see Words and Phrases, vol. 1, pp. 174, 175.]

4. FOOD (§ 5*)—FOOD AND DRUGS ACT—CONSTRUCTION—"ADDED."

The court, in construing the Food and Drugs Act, § 7, cl. 5, declaring that an article shall be deemed to be adulterated if it contain any added poisonous or other added deleterious ingredient which may render the article injurious to health, must give effect to the word "added," and not construe the clause in the same way that an almost identical clause relating to confectionery with the exception of the omission of the word "added" must be construed, for the court must give effect to all the words of a statute in their ordinary sense.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

5. FOOD (§ 5*)—FOOD AND DRUGS ACT—CONSTRUCTION—"ADDED."

The test whether a deleterious ingredient is added to an article of food within Food and Drugs Act (Act June 30, 1906, c. 3915, 34 Stat. 769 [U. S. Comp. St. Supp. 1911, p. 1356]) § 7, declaring that an article shall be deemed adulterated if it contain any added poisonous or deleterious ingredient, depending on whether the ingredient is in its natural or in an artificial form, may often be a useful aid in applying and interpreting the statute, but it cannot be applied where artificially compounded foods are under consideration.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

6. FOOD (§ 5*)—FOOD AND DRUGS ACT—CONSTRUCTION—"ADDED."

The court, in construing the phrase "added poisonous or added deleterious ingredient," in Food and Drugs Act, § 7, cl. 5, declaring that an article shall be deemed to be adulterated if it contain any added poisonous or other added deleterious ingredient, must consider section 8, providing that an article of food which does not contain any added poisonous or deleterious ingredient shall not be deemed to be adulterated or misbranded, in specified cases, and, when so construed, the act requires a standard before there can be any added ingredient or adulteration.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

7. FOOD (§ 5*)—FOOD AND DRUGS ACT—CONSTRUCTION—ADDED.

The Food and Drugs Act, entitled "An act for preventing the manufacture, sale, or transportation of adulterated or misbranded or poisonous or deleterious foods," makes no distinction between compounds known at its date and those thereafter devised, but the act does not absolutely forbid the use in any compound of any element that a jury may call deleterious, but Congress, having selected and regulated the use of those things known to be particularly dangerous, has not wholly forbidden other things from which no serious danger need be anticipated.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

8. FOOD (§ 5*)—FOOD AND DRUGS ACT—CONSTRUCTION—"ADDED."

The word "added" in Food and Drugs Act § 7, declaring that any article shall be deemed adulterated if it contain any added poisonous or other added deleterious ingredient, may be construed as being used with reference to a possibly deleterious food ingredient beyond the quantity in which the ingredient is normally found in usual or customary articles of food, and no such ingredient should be considered as added, provided it is present only in the quantity in which it existed in common articles of food generally known, and so construed, caffeine, forming an ingredient of Coca Cola, and in less amount than common in coffee, is not an added deleterious ingredient.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

9. FOOD (§ 15*)—FOOD AND DRUGS ACT—MISBRANDING.

Under the Food and Drugs Act, § 8, declaring that an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be misbranded in specified cases, a compound sold under the distinctive name of Coca Cola, which is a distinctive name of the product of the manufacturer thereof and of nothing else, is not misbranded, "Coca" being indicative of one article, "Cola" being indicative of another distinct article, and the combination not being descriptive of any substance or combination known until adopted by the manufacturer, and still unknown as an appellation for any other substance on the market.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 14; Dec. Dig. § 15.*

What constitutes a violation of pure food regulations, see note to Brina v. United States, 105 C. C. A. 559.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the District Court of the United States for the Eastern District of Tennessee; Edward T. Sanford, Judge.

Libel by the United States for condemnation of 40 barrels and 20 kegs of Coca Cola, the Coca Cola Company claimant. There was a judgment (191 Fed. 431) denying relief, and the United States brings error. Affirmed.

W. B. Miller and Lewis M. Coleman, U. S. Atty., both of Chattanooga, Tenn., for the United States.

J. B. Sizer, of Chattanooga, Tenn., and Harold Hirsch, of Atlanta, Ga., for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. This proceeding was brought by the United States to condemn a quantity of syrup called Coca Cola. Forfeiture was claimed under the Pure Food Law (34 U. S. S. L. 768), because the syrup was said to be adulterated and misbranded. The case was tried at great length before a jury; at the conclusion of the trial, the government withdrew certain issues, and upon the two remaining matters, the court instructed a verdict for the Coca Cola Company, the claimant of the property. The sole question presented by this writ of error is whether there was any evidence tending to show that the article was either adulterated or misbranded within the prohibition of the act. The facts presented and the questions involved are so well set out by the District Judge in his carefully prepared opinion (191 Fed. 431)[1] that we refrain from further preliminary statement. The sections and clauses of the act which it seems may have some bearing on the question before us are given in the margin.[2]

---

[1] The parts of the libel voluntarily dismissed by the government were those matters numbered 4 and 5 in the District Judge's opinion; the statement on page 440 of 191 Fed. is erroneous in this respect.

[2] "Sec. 6.  *  *  *  the term 'food,' as used herein, shall include all articles used for food, drink, confectionery or condiments, by man or other animals, whether simple, mixed or compound.

"Sec. 7. That, for the purposes of this act, an article shall be deemed to be adulterated  *  *  *  in the case of food  *  *  *  third, if any valuable constituent of the article has been wholly or in part abstracted  *  *  *  fifth, if it contain any added poisonous or other added deleterious ingredient which may render such article injurious to health.

"Sec. 8. That the term 'misbranded' as used herein, shall apply to all drugs or articles of food or articles which enter into the composition of food, the package or label of which shall bear any statement, design or device regarding such article or ingredients or substance contained therein which shall be false or misleading in any particular  *  *  *  that for the purposes of this act, an article shall also be deemed to be misbranded  *  *  *  in the case of food: First, if it be in imitation of or offered for sale under the distinctive name of another article. Second, if it be labeled or branded so as to deceive or mislead the purchaser  *  *  *  or if it fail to bear a statement on the label of the quantity or proportion of any morphine, opium, heroin, alpha or beta eucane, chloroform, cannabis indica, chloral hydrate or acetanilid or any derivative or proportion of any such substances contained therein.  *  *  *  Fourth, if the package containing it or its label shall bear any statement, design or device regarding the ingredients or the substance contained therein, which statement, design or device shall be false or misleading in any particu-

[1, 2] In applying a statute to particular facts and where it becomes necessary to construe language to which opposing sides give different meanings, it is vital to have in mind the essential scope and purpose of the act. The present case well illustrates the importance of this consideration. Much of the government's contention as to the extent of the prohibitions here found rests upon the theory that Congress intended to protect the public health by preventing (to the extent of the constitutional power resting in the commerce clause) the sale or transportation of deleterious foods. The opposing contention denies this broad purpose and concedes only the intent to prevent any fraud or deception in the sale of foods. The title to the act is broad enough to support the government's utmost claim as to general purpose. It is, "An act for preventing the manufacture, sale, or transportation of adulterated or misbranded or poisonous or deleterious foods," etc. If there was nothing in the body of the act expressly prohibiting the sale of deleterious food, qua deleterious, this title would furnish some reason for expanding in that direction any terms of prohibition there might be ambiguous enough to permit the implication (Goodlett v. L. & N. R. R., 122 U. S. 391, 408, 7 Sup. Ct. 1254, 30 L. Ed. 1230); but we find in section 11, which relates solely to importations from foreign countries, an express direction that such importation shall be wholly forbidden if the food is adulterated or misbranded "or is otherwise dangerous to the health of the people of the United States." We have therefore a provision which responds to the call of the title in this particular and makes it unnecessary to resort to any otherwise unjustifiable construction for the mere purpose of giving some effect to all parts of the title. With the exception of this clause of section 11, every other directly or indirectly prohibitory clause of the act relates to articles which carry the taint of deception and fraud by being adulterated or misbranded. Section 2 prohibits interstate commerce in any article "which is adulterated or misbranded, within the meaning of this act" and subsequent clauses of the same section refer to "any such article so adulterated or misbranded within the meaning of this act," and to "any such adulterated or misbranded foods." The expert examination provided for by section 4 is to determine "whether such articles are adulterated or misbranded." Section 7 defines when, for the purposes of the act, an article shall be deemed to be adulterated, and section 8 defines the term "misbranded" as used in the act, and specifies when, for the purposes of the act, an article shall be deemed

lar; provided that an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be adulterated or misbranded in the following cases: First, in the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food under their own distinctive names and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand, with a statement of the place where said article has been manufactured or produced. Second, * * * and provided further that nothing in this act shall be construed as requiring or compelling proprietors or manufacturers of proprietary foods which contain no unwholesome added ingredient, to disclose their formulas, excepting so far as the provisions of this act may require to secure freedom from adulteration or misbranding."

to be misbranded. Section 9 prescribes a certain immunity from prosecution when there is a guaranty to the effect that the article is not adulterated or misbranded within the meaning of the act. Section 10 provides for the seizure and forfeiture of the offending articles, but its effect is limited to an article which is adulterated or misbranded within the meaning of the act. A subsequent clause of section 10 furnishes some superficial support for the broader theory of the purpose of the act by providing for the disposition of the offending article, if it "is condemned as being adulterated or misbranded or of a poisonous or deleterious character within the meaning of this act"; but this support is only superficial, because the power to condemn, given by the first part of section 10, rests on the finding that the article is "adulterated or misbranded." This general reference to a poisonous or deleterious character as ground of condemnation must be to instances where that character, by incorporation into the article, causes the fatal adulteration or misbranding. Considering all these parts of the act, together with its title, we cannot doubt that, so far as its general purpose and intent furnish any aid for interpretation, that general purpose and intent must be deemed to be the prevention of fraud and deception, so that the purchaser can get the thing he has a right to suppose he is getting, rather than the protection of the public health to the extent of preventing the purchaser from deliberately and intentionally buying a particular food which is what it purports to be, even though a jury might think it "deleterious." If argument were needed to sustain this conclusion, it could be found in the provisions as to drugs. Foods and drugs are put on the same basis throughout, save as to matters of definition, and some detailed requirements. There can be no room to suppose that the act was intended to prohibit broadly the sale of all deleterious foods and not to prohibit with equal breadth the sale of all poisonous drugs. The latter supposition is impossible, and so the former cannot be accepted. Further support will be found in the provisions which, by necessary implication, permit the sale of foods containing cocaine, morphine, and the like, provided the purchaser is properly advised of the contents. These views of the general purpose of the act have been accepted by the decisions, so far as they go. Savage v. Jones, 225 U. S. 501, 533, 535, 32 Sup. Ct. 501, 56 L. Ed. 1182; McDermott v. Wisconsin, 228 U. S. 115, 131, 33 Sup. Ct. 431, 57 L. Ed. 754, 47 L. R. A. (N. S.) 984; United States v. Lexington Co., 232 U. S. 399, 409, 34 Sup. Ct. 337, 340 (58 L. Ed. 658).

The general language of the court in the last-cited case that "the statute was intended to protect the public health from possible injury" is not at all inconsistent with the view we have expressed, because that language is used with reference to adulterations and the addition to known foods of injurious elements. The very word "adulterated" imports fraud and deception; it implies that the article is not what it purports to be.

[3] Under the statement of facts, it is clear that the only question arising under section 7 is whether the caffeine in the Coca Cola is an "added poisonous or other added deleterious ingredient which may render such article injurious to health"; and, under the assumption made by the District Judge, of which the government cannot com-

plain, and which we here adopt, but only for the purposes of this opinion—i. e., that there was evidence requiring submission to the jury to the effect that caffeine is a poisonous or deleterious ingredient which may render the Coca Cola injurious to health—it is equally clear that the turning point is whether it can be said, or whether a jury could be permitted to say, that the caffeine was "added" within the meaning of this clause.

It is impossible intelligently to conceive the meaning of "added," unless we suppose a base upon which the addition is placed, and we at once meet the question: If caffeine is the addition, what is the base? For 15 years before the passage of the act, Coca Cola had been an existing article of food (within the statutory definition of "food"), and in the latter 10 years of that period it had been one of the most widely known and used articles of its general class. It was a compound; it had no distinctive base (unless water, by reason of its larger proportion); it was made up of water, sugar, caffeine, phosphoric acid, glycerine, lime juice, coloring matter, flavoring matter and "merchandise No. 5." Each of these elements is more or less important; there seems to be no method of determining their relative importance; but if any one may be rejected as comparatively negligible or secondary or noncharacteristic, that one is not caffeine. In the manufacturing process, water and sugar are boiled to make a syrup; this boiling is repeated; then caffeine is "added," and then the syrup is boiled once or twice more; the syrup is then put into a cooling tank and then into a mixing tank in which the remainder of the process is carried on, and in which the other elements become part of the ultimate combination. It is plain as may be that without caffeine the mixture would not be Coca Cola, and the purchaser who had been using it in its standard form 15 years when the act was passed, and who might then buy an article of the same name which did not contain any caffeine, would rightfully think that he was deceived; and yet it is said that the act intended to prevent misleading the public is violated unless the public is thus misled.

It is another form of the same thought to say that the mere use of the word "adulterate" or "added" implies the existence of a standard, and it is a contradiction in terms to say that the use of an element necessary to constitute the standard is an adulteration of, or addition to, the standard; but to this contradiction, the argument for the government necessarily leads. So, further, we find that clause 3 of that division of section 7 relating to foods declares adulteration if any valuable constituent has been abstracted. Caffeine is a valuable constituent. If it is omitted, the article is adulterated, and if it is included, the article is adulterated. We must break clause 3, to keep clause 5.

[4] It is urged that in case of a compound article each element is, in a proper sense, "added," and so, if any element is deleterious, it is an "added deleterious ingredient." This position not only depends in part upon what we have thought an erroneous view of the general purpose of the statute, but it destroys all force in the word "added" and gives clause 5 of that part of section 7 relating to food precisely the same meaning as if it read "if it contain any poisonous or other deleterious ingredient," etc. The deliberate and careful insertion of the

word "added" before the word "poisonous" and again before the word "deleterious," while the word is omitted in the preceding almost identical clause relating to confectionery, cannot be treated as accidental or meaningless. So to do would violate the settled rule of construction which requires us to "give full effect to all the words in their ordinary sense" (Bend v. Hoyt, 13 Pet. 263, 10 L. Ed. 154), and requires that "signification and effect shall, if possible, be carried to every word" (Washington Co. v. Hoffman, 101 U. S. 112, 115 [25 L. Ed. 782]), and declares it the "duty of the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the Legislature was ignorant of the meaning of the language it employed" (Montclair v. Ramsdell, 107 U. S. 147, 152, 2 Sup. Ct. 391, 395 [27 L. Ed. 431]).

[5] Again, it us urged that the true test whether the deleterious ingredient is "added" is whether this ingredient is in its natural or in an artificial form. This criterion is supposed to find support in statements made during the Congressional debates, and in the well-known fact that many natural articles of food, like fruits, contain elements which in the combination formed by the complete fruit are not materially harmful, but which, when extracted and administered separately, may be injurious. This criterion may often be a useful aid in applying and interpreting the statute, but to apply it as a hard and fast rule where artificially compounded foods are under consideration comes to saying, in the case before us, that if coffee berries or tea leaves, or, we take it, the complete extract of coffee berries or tea leaves, containing the amount of caffeine now in question, were put into the compound in its manufacture, there would be no violation of the law, but that if the caffeine, and that only, which was in these same coffee berries or tea leaves, or in some other natural product, is put into the syrup, the law is broken. Alcohol surely might be considered a "deleterious ingredient" if caffeine may be; but can we suppose that a compound food would be obnoxious to this law if it contained 5 per cent. of alcohol purchased in the market ready distilled and yet that a compound otherwise the same would be within the approval of the law though it contained 25 per cent. of alcohol distilled from grain during the process of making the compound? There has been much controversy whether "blended whisky" could be sold under that name, but it has never been thought to be forbidden merely because its alcohol was an "added" ingredient. Many wines are "fortified" by adding alcohol, and these may be obnoxious to the law for other reasons; but if the theory now under consideration is correct, they could not be sold at all, no matter how labeled. This theory must even lead us to say that if a ground or pulverized coffee or a coffee extract is so deficient in caffeine as to be below standard, the law is violated by adding from another source caffeine enough to make the coffee of full normal strength, or to say that it is a vital distinction whether the citric acid contained in any familiar and popular acid beverage is, at the time of compounding, squeezed from a lemon or poured from a bottle. We cannot follow the argument which brings us to those results. Not only is it without basis in the statute, but it lacks inherent cogency.

[6] We get from section 8 some help on the proper meaning of the phrase "added poisonous or deleterious ingredient," because unquestionably the two sections must be construed together and the same phrase should have the same construction in each. The proviso of the fourth paragraph of that part of section 8 relating to food seems to be drawn with express reference to situations like the present. Congress must have known that many proprietary articles of food and drugs were upon the market under proprietary or trade names, and Congress thought fit to provide that these things should not be deemed to be adulterated unless any deleterious ingredient contained therein was "added." This recognizes somewhat more expressly than is done by section 7 the thought that the necessity of a standard before there can be any adulteration applies as well to compounds as to simple foods, and then avoids future difficulties in application by providing that the compound article, in its distinctive and known form, should be the standard.

[7] We do not overlook the argument that the act makes no distinction between compounds known at its date and those thereafter devised, and so that the construction which prevents an inherent element from being considered as "added" leaves the manufacturer at liberty to use any poison he pleases in making up his compound "food," provided only he gives to it and sells it under a distinctive name. This conclusion must, to some extent, be granted, yet it loses most of its apparent force when we remember the real purpose of the act and observe the express direction of the law that the maker of a proprietary food need not disclose its contents if he states the place of manufacture. It would seem a proper provision that if a proprietary food contains any ingredient fairly subject to be called deleterious, the maker should disclose on the label its presence and its extent, just as is required in numerous specific instances; but we cannot make such a law. On the other hand, it is difficult to suppose that Congress intended absolutely to forbid the use in any compound of any element that a jury might later call "deleterious"; but it must be one thing or the other. From this point of view, the prohibition is either absolute or nonexistent. The best known habit-forming drugs are selected, and implied permission is given to allow their use in compounding products for sale, provided they are named on the label; but as to the great mass of other food and drug elements which are undoubtedly deleterious if used to excess, there is no provision for naming them on the label. If they are within the definition of "added deleterious ingredient," they may never be used under any conditions or in any quantity that may be injurious to health, even though they are described in the largest of letters on the outside of the package. This way of reading the statute would practically greatly impede the progress of synthetic chemistry in foods, and we think it distinctly more unreasonable than it is to suppose that Congress, having selected and regulated the use of those things known to be particularly dangerous, thought best not wholly to forbid at that time other things from which no serious danger need be anticipated.

[8] There is a middle view which is sufficient for the purposes of this case, and which will recognize the composite meaning of "added

deleterious" rather than the separate meaning of each word. This view is that in using the word "added" with reference to a possibly deleterious food ingredient, Congress had in mind an addition above and beyond the quantity in which such ingredient was normally found in usual and customary articles of food, and that no such ingredient should be considered as "added" if it was present only in the quantity in which it existed in these common articles of food with which every member of Congress was familiar, and which had generally been thought wholesome. For example, creosote and other products of destructive wood distillation are, independently considered, injurious, but they have always been present in smoked hams. Can the addition of the same preservatives to the same extent to the same meat be something that Congress intended to prohibit? The boric acid, found in apples, is a preservative. If certain apples which are to be preserved are not up to the maximum in this element, did Congress intend to forbid supplying the deficiency by the same element from another source? Acetic acid may, of course, be injurious, but if, by its use, an artificial vinegar is made which is chemically and in every way equivalent to the natural vinegar familiar to the members of Congress in many compounds, would they have thought of it as a deleterious addition? No example is so clear as the very one here involved. Every member of Congress had been familiar, from childhood, with tea and coffee; perhaps most of them drank one or the other. The average cup of coffee contains more than two grains of caffeine; the average cup of tea, one and one-half grains. A glass of Coca Cola, as consumed, contains one and one-fifth grains of caffeine. The chemical qualities and the physiological effects of the caffeine which is in the tea or coffee and of the caffeine which is in the Coca Cola are precisely the same. We are quite convinced that the use in an artificial beverage of a certain element which had been one of its characteristic elements for many years, and when such use was in a less proportion than the same element was known to make up in different natural beverages then in universal use and generally thought wholesome—that such an element so employed could not have been within the meaning of Congress when it chose the words "added deleterious ingredient."

[9] The question arising under section 8—the misbranding section—is to be determined by the proviso under the fourth clause relating to food. Separate reference to the first clause which forbids sale "under the distinctive name of another article" is unnecessary, because the same prohibition is repeated in the proviso under clause 4. We have reached the conclusion that Coca Cola does not contain any "added poisonous or deleterious ingredients," and it is undisputed that the labels carry a statement of the place of manufacture. Hence, this proviso declares that Coca Cola shall not be deemed to be adulterated or misbranded if it was or is known as an article of food under its own distinctive name and if it is not in imitation of or offered for sale under the distinctive name of another article. It is an article of food, under the definition of the statute. That it was, at the time of the passage of the law and ever since has been, known under its own distinctive name is too clear for question, except as it is said that the

adopted name cannot be its distinctive name because it is the distinctive name of another article. Neither is it said to be an imitation of another article; except as these words also raise the same question whether it is sold under the distinctive name of another article. Coming to that question, and just as on the subject of adulteration we must first find the standard, we here first meet the inquiry: What is the "distinctive name of another article" under which name Coca Cola is sold? The record makes it very clear to us that there is no such other article. No article except plaintiff's compound is or ever has been sold "under the distinctive name," Coca Cola (until defendant's infringement). These words constitute and are the distinctive name of claimant's product, and they are the distinctive name of nothing else. "Coca" is indicative of one article; "cola" is indicative of another, very distinct, but "Coca Cola" was not, in 1892, and (save for the general knowledge of plaintiff's article) is not now intelligently descriptive of any combination of the two. It might be medicine, food or drink; it might be to swallow, smoke, or chew. These associated words as the distinctive name of any substance or combination of substances were unknown until adopted by plaintiff; that "distinctive name" is still unknown as an appellation for any other substance on the market.

The burden put upon the government to show that Coca Cola is masquerading under the distinctive name of another article is surely more exacting than the burden on one attacking the trade-mark to show that the name is sufficiently misleading as indicating the make-up of the product so that it is an improper trade-mark. We consider the latter question in our opinion this day filed in Nashville Syrup Co. v. Coca Cola Co., 215 Fed. 527, 132 C. C. A. 39, and conclude that the name carried no forbidden deception. We need not here repeat that discussion. If that conclusion is correct, it is even more certain that Coca Cola is not guilty of posing "under the distinctive name of another article."

It follows that the judgment below must be affirmed.