## Commonwealth v. Allen Products Company, Inc.

*George J. Joseph*, District Attorney, for Commonwealth.

*Wallace H. Webster, Jr.*, for defendant.

SCHEIRER, J., August 28, 1962.—Defendant, Allen Products Company, Inc., manufacturer of dog and cat food under the trade name of "Alpo" was convicted on January 4, 1961, before a justice of the peace for a violation of section 6(c) of the Commercial Feed Act of May 29, 1956, P. L. (1955) 1788, 3 PS §57.6(c). Defendant filed a petition for the allowance of an appeal which was answered by the district attorney. In lieu of taking depositions, the district attorney and counsel for defendant entered into a stipulation as to the facts forming the basis of an appeal. The matter is before us after argument.

The act in question defines "commercial feed" as "all materials which are distributed for use as feed for animals." Section 3 titled "Registration" provides for each brand of commercial feed to be registered with the

Department of Agriculture. The application for registration is to include certain information including:

"(3) The guaranteed analysis listing the minimum percentages of crude protein and crude fat and the maximum percentage of crude fiber, except in case of products sold solely as mineral or vitamin supplements or combinations thereof, in which case they need not show guarantees for protein, fat and fiber."

Section 4, titled "Labelling," provides that commercial feed offered for sale shall have placed thereon a label upon which certain information shall appear including that required in section 3 above noted and pertaining to the "guaranteed analysis."

Section 6, the violation of which defendant is charged, defines adulteration as follows:

"No person shall distribute an adulterated commercial feed. A commercial feed shall be deemed to be adulterated, . . . (c) When its composition or quality falls below *or differs from that which it is purported to be or is represented to possess.*" (Italics supplied.)

The act declares it to be the duty of the Secretary of Agriculture to "sample, inspect, make analyses of, and test commercial feeds . . . to determine whether such commercial feeds are in compliance with the provisions of this act."

Provision is made for penalties for violations of the act.

A sample of defendant's product, Alpo Dog Food, Lamb and Lamb By-products, was taken June 9, 1960, and analyzed August 31, 1960. The guaranteed analysis appearing on the sample can indicated not less than three percent of crude fat. The analysis of the Department of Agriculture revealed that the amount of fat found in the sample was 11.90 percent. The information sworn to by an agent of the Secretary of Agriculture stated that "the product is adulterated by virtue of containing four times the amount of fat reasonably

assumed to be present." It was stipulated and agreed that the variance between the content of fat specified in the information, i.e., four times the amount reasonably assumed to be present, and the proof at the hearing, i.e., 11.90 percent was not to be considered a material variance. A letter from the acting Director, Bureau of Foods and Chemistry, Department of Agriculture, introduced as an exhibit in the case, stated:

"Our action was not based on a single can but based on the fact that two cans which were analyzed separately both indicated the excessive fat content. The public has a right to know, within reasonable limits, the amount of fat in a product when the minimum guarantee is stated."

The petition seeking the allowance of an appeal stated, in substance, these grounds:

1. The act should be read as a whole. Referring to the designation on the label of a minimum of fat at three percent and the finding by analysis of 11.90 percent fat. "There is no designation in the act, nor under Section 6(c) of violation of allowance of composition or quality and the Bureau of Foods and Chemistry has no regulations governing this point."

2. Petitioner has a full and complete defense in that it has met the requirement of placing upon its label a minimum guaranteed fat content, and it is possible for certain cans to contain more crude fat than others. The writer of the above referred to letter from the Bureau of Foods and Chemistry admits that the minimum guarantee of fat contained in the sample (we interpret this to mean on the label) has been complied with; the excess (in the can) would not be a violation of the act.

3. The finding of guilty was in disregard of the facts and the law in this case.

The brief of defendant's counsel goes to considerable length to describe how difficult it is for defendant's can-

ning process to control the fat content of its product. In the absence of proof of the unreasonableness of the statute, this argument has no validity. "A court may be guided by the statutorily declared presumptions that the Legislature does not intend a result that is absurd, impossible of execution or unreasonable, or violative of constitutional provisions, that an ambiguous statute is intended to have the most reasonable and beneficial operation that its language permits, and that all legislation intends to favor the public interest as distinguished from purely private interests": 34 P. L. Encyc., §126.

It is further argued that the product in question, meat or meat products, as a feed to animals, without other ingredients added, should have a separate or special section governing its regulation. Of course, this is an argument to be advanced to the legislature, not to a court of law. We have difficulty in comprehending why it is more difficult to ascertain fat content in dog food containing meat or meat by-products than in dog food containing meat or meat by-products and barley or soy grits.

It is further argued in defendant's brief that section 3(a)(3), 3 PS §57.3, and section 6(c), 3 PS §57.6, of the act in question are ambiguous and vague without reference to limitation or tolerance of variance; that vegetable and animal content must of necessity have a degree of variation; that the interpretation of the act requires a degree of variation of analysis of the product so long as such variation is not so significant as to change the product from its identification.

Defendant is contrasting section 3(a)(3), having to do with registration, and section 6(c), pertaining to adulteration. The charge brought against defendant is not for failure to register the guaranteed analysis listing the minimum percentages of crude protein and crude fat and the maximum percentage of crude fibre,

but rather for the distribution of an adulterated commercial feed deemed to be adulterated when the feed's *composition or quality differs from that which it is purported to be or is represented to possess.* See section 6(c). (Italics supplied.)

At first blush, defendant's argument would seem to have merit since section 3(a)(3) relating to registration requires the minimum percentage of fat to be registered with the Department of Agriculture and under section 4 to be labelled on the container. First, the requirement of registration as to fat is in terms of the minimum and 11.90 percent is higher than the minimum. Why are protein and fat percentages to be stated in the minimum and fibre in the maximum? Protein is a desirable content of dog food as is fat in reasonable amount. Fibre in excessive amounts is not desirable. Obviously, 11.90 percent is higher than three percent; thus, defendant argues there is no violation of the act, but we reiterate that defendant is charged with adulteration of its product. The clear purpose of section 6(c) is to prevent the distribution of adulterated commercial feed (defined in the act as materials distributed for use as feed for animals) and when the public buys cans of dog food marked on their labels as containing a minimum of three percent fat when, in fact, the cans contain 11.90 percent fat, the seller is guilty of distributing adulterated commercial feed. The act is simply an inspection law designed to protect the public against the sale of adulterated commercial feeding stuff.

Second, it is argued that vegetable and animal content in feed must have a degree of variation so long as the variation is not so significant as to change the product from its identification. This argument goes to reasonableness of enforcement as when a motorist is charged with driving 51 miles per hour on a 50 mile per hour highway. In such case, a court would generally

grant relief to the motorist. In the case before us, the difference between three percent fat content and 11.90 percent fat content is a considerable variance, and the statement in the information that "the product is adulterated by virtue of containing four times the amount of fat reasonably assumed to be present" is not a serious overstatement. In this connection, defendant's counsel's statement in his brief that counsel for the Commonwealth concurs in the stipulation that the percentage variance of this product is not a material variance is not in accord with the facts. The stipulation merely referred to the variance between the content of fat specified in the information and the proof of fat content at the hearing. The stipulation was not to the effect that the variance between three percent, as marked on the can, and 11.90 percent, as analyzed, was not to be considered a material variance. The variance referred to was in the proof as opposed to the charge.

Counsel has indicated that this case is of first impression in this Commonwealth interpreting the Act of 1956. Our own research has uncovered a statute of Indiana, so similar to the one under consideration that it might well have served as a model. The Indiana Act was examined by the United States Supreme Court in an opinion written by the learned and eminent Justice Charles Evans Hughes and decided June 7, 1912. See Savage v. Jones, State Chemist of the State of Indiana, 225 U. S. 501.

The principal contention in support of the appeal before the Supreme Court was that the Indiana statute (Acts 1907, Chapter 206) was an unconstitutional interference with the complainant's right to engage in interstate commerce.

The title of the Indiana Act provided, in part, for inspection, analysis and the regulation of sale of con-

centrated commercial feeding stuff; prohibiting the sale of fraudulent or adulterated feeding stuff; providing for guarantees of the ingredients of feeding stuff; providing for the affixing of labels as evidence of the guarantee and inspection thereof; the collection of an inspection fee and fixing penalties. Section 1 requires registration with the State Chemist, the filing of the ingredients from which the feeding stuff is compounded and the minimum percentage of crude fat or crude protein and the maximum percentage of crude fibre guaranteed in the product.

Section 2 requires the affixing of a label to every container which shall state, amongst other facts, the guaranteed analysis indicating the minimum percentage of crude fat and crude protein.

Section 6 provides, in part, that anyone who shall sell any commercial feeding stuff which is found by an analysis made by the State Chemist to contain a smaller percentage of crude fat or crude protein than the minimum guarantee *or which shall be labelled with a false or inaccurate guarantee*, or who shall adulterate any feeding stuff with foreign mineral matter or other foreign substance such as rice hulls, etc., or other materials of less or of little or no feeding value without so stating on the label or who shall adulterate with any substance injurious to the health of domestic animals shall be guilty of a misdemeanor. (Italics supplied.)

The act further contains provisions for the sale of stamps from the State Chemist showing registration, for the analysis of commercial feed, and the State Chemist is authorized to prescribe and enforce regulations to carry the act into effect. Penalties for the violation of the act are provided. The definition of concentrated commercial feeding stuff includes, in addition to certain meals and grains, ground beef or fish scraps, meat meals and slaughter house waste products used for food for domestic animals.

It will be noted that the act makes it an offense to sell feed containing a "smaller percentage of crude fat or crude protein than the minimum guarantee." This section may give heart to defendant. However, we believe that the portion of the act making it a crime to sell feed bearing a label with a false or inaccurate guarantee is comparable to section 6 (c) under the heading of "adulteration" and with which defendant is charged. Under the Indiana Act, selling feed "which shall be labeled with a false or inaccurate guarantee" is a separate offense from that contemplated in section 1 where the distributor is required to file a certificate stating among other facts "the minimum percentage of crude fat or crude protein . . . and the maximum percentage of crude fibre" which the manufacturer guarantees it to contain. It will be noted that section 3(a)(3) of the Pennsylvania Act similarly refers to "the guaranteed analysis" to be stated on the application.

Mr. Justice Hughes said, at page 524, of Savage v. Jones, supra:

"The evident purpose of the statute is to prevent fraud and imposition in the sale of food for domestic animals, a matter of great importance to the people of the State. Its requirements were directed to that end, and they were not unreasonable. . . . The practice of selling feeding stuffs under general descriptions gave opportunity for abuses which the legislature of Indiana determined to correct, and to safeguard against deception it required a disclosure of the ingredients contained in the composition. . . . It does demand a statement of the ingredients, and also of the minimum percentage of crude fat and crude protein and of the maximum percentage of crude fiber, a requirement of obvious propriety in connection with substances purveyed as feeding stuffs."

And at page 528:

". . . the State of Indiana . . . was entitled, in the exercise of its police power, to require the disclosure of the ingredients contained in the feeding stuffs offered for sale in the State, and to provide for their inspection and analysis. . . . It is said that the statute permits the State, through its officials, to set up arbitrary standards governing conditions of manufacture. But it does not appear that any arbitrary standard has been set up, or that there has been any attempt to enforce one against the complainant."

And again, at page 539:

"Applying these established principles to the present case, no ground appears for denying validity to the statute of Indiana. That State has determined that it is necessary in order to secure proper protection from deception that purchasers of the described feeding stuffs should be suitably informed of what they are buying and has made reasonable provision for disclosure of ingredients by certificate and label, and for inspection and analysis. . . ."

It is our conclusion that the appeal of defendant must be refused. For defendant to register and label his product as possessing three percent minimum fat and selling it with a fat content of 11.90 percent is clearly selling an adulterated product as prohibited by section 6(c) of the Act of 1956, and for defendant to be charged with distributing adulterated food under section 6(c) is a different and separate charge than is contemplated in section 3(a)(3) which covers what in part is required on the application for registration of the brand of commercial feed being offered for sale or distribution. Defendant apparently complied with the application provision in section 3(a)(3), and it was not charged with violation of this section. The growth and aggressiveness of defendant's business is to be commended, and we regret to find a responsible busi-

nessman guilty of violation of a statute, but we also feel that the public has a right to know what it is buying. When a label refers to a "minimum fat content of three percent," the average purchaser assumes the fat content is somewhere in that neighborhood. The product sold by defendant and in question here is "Lamb Chunks and Lamb By-products" and the statement on the label is to the effect that *The meat* is electrically broiled to preserve utmost flavor and aroma." The customer has a right to purchase *meat*, and merely because it is required to state the minimum percentage of fat on the label gives the seller no right to sell a product that is substantially higher in fat content. What was said by Mr. Justice Hughes in 1912 that the Indiana statute on commercial feeds covered a matter "of great importance to the people of the State" would be more than pertinent in this Commonwealth in 1962 when the care and feeding of pets has become "big business." The growth of defendant's business attests to this fact in a most remarkable manner.

It should be observed that the change after arrest on defendant's label on cans containing lamb and lamb chunks increasing the minimum content of fat from three percent to eight percent is of no legal significance in this appeal, except to correct what the Commonwealth found to be an improper practice.

We find that defendant was properly found guilty on the proof submitted before the justice of the peace and that the statute in question, considered as a whole, is a valid exercise of the police power.

### Order

Now, August 28, 1962, the rule heretofore granted to show cause why an appeal should not be allowed is discharged and the appeal refused. Defendant is ordered to pay a fine of $50, the costs before the justice of the peace and the costs of this proceeding.