[No. 6053–5–III.  Division Three.  February 26, 1985.]

BRIAN P. HEPLER, *Respondent,* v. CBS, INC., *Appellant.*

*Eric Richter, Skeel, Henke, Evenson & Roberts, C. Bruce DiLuzio,* and *Roberts, DiLuzio & Scanlon,* for appellant.

*Duane Schofield,* for respondent.

MUNSON, J.—Columbia Broadcasting System, Inc. (CBS) appeals a judgment finding it liable for breach of contract in connection with its administration of an employee benefit plan established under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.,* and violation of the Washington Consumer Protection Act, RCW 19.86. CBS contends: (1) federal law preempts the application of the Washington Consumer Protection Act; and (2) CBS's actions in utilizing an artificial salary base in determining Brian P. Hepler's benefits were not arbitrary and capricious. Mr. Hepler has filed a cross appeal, claiming the trial court erred in refusing to apply Pennsylvania law allowing punitive damages for fraud, and in denying his demand for a jury trial on the issue of punitive damages. Alternatively, Mr. Hepler contends the trial

court should have awarded him treble damages up to $10,000 pursuant to the 1983 amendment to RCW 19.86-.090. We affirm in part and reverse in part.

In March 1980, W. B. Saunders Company, a subsidiary of CBS, placed an advertisement in a Spokane newspaper to hire a commissioned salesman. Mr. Hepler responded to the advertisement and was interviewed in Spokane by the regional sales manager for W. B. Saunders Company. At the end of the interview, Mr. Hepler was given a packet containing information on employee benefits. One brochure contained information about a long–term disability plan.

Mr. Hepler was subsequently hired by W. B. Saunders Company and later received an employment agreement which had already been executed by the company. He signed the agreement in Spokane and returned it to W. B. Saunders' office in Pennsylvania. The employment agreement specified Mr. Hepler was to be paid on a straight commission basis and would receive no additional salary. The agreement also provided: "This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of Pennsylvania applicable to contracts performed entirely therein."

After returning the signed copy of the employment agreement, Mr. Hepler received a disability insurance enrollment form and another copy of the long–term disability plan brochure. He voluntarily enrolled and contributed to the plan through authorized deductions from his biweekly paychecks. His paychecks were issued directly by CBS's corporate offices in New York.

The brochure indicated the plan was a "welfare plan" under ERISA and provided that 26 weeks after an employee becomes totally disabled, he is entitled to benefits for 24 months if he cannot perform the duties of his regular occupation. The brochure further provided the amount of benefits a participant received would be based upon his "basic monthly earnings."

> Your *basic monthly earnings* is your regular pay, excluding overtime, bonuses and any other additional forms of

compensation, unless an adjustment has been made for the purpose of Company benefits.

The contribution to be paid by the employee was three–quarters of 1 percent of his basic weekly earnings.

The brochure also provided:

> *Other sources of disability income* include Social Security, either *Primary* (payable to you alone) or *Family* (payable to you and your eligible dependents), plus any salary payments made to you by the Company, or other payments made under law, as explained in more detail below.
>
> If Primary Social Security benefits are payable, the LTD Plan in *combination* with all other monthly income benefits will continue 60% of your basic monthly earnings, up to a maximum *combined* monthly benefit of $5,000 from all sources.
>
> If Family Social Security benefits are payable, your LTD Plan benefits may be adjusted so that combined income from all sources does not exceed 75% of your basic monthly earnings.
>
> In no case, however, will you ever receive less than $50 a month from the LTD Plan no matter how much you receive from all other sources. And once your LTD Plan benefit payments begin, any increase in Social Security will have no effect on the amount of your LTD Plan benefit. These additional Social Security benefits will simply add to your total income.
>
> In addition to Social Security, other sources of disability income include Workers' Compensation, state disability benefits, similar statutory benefits, salary payments you receive from CBS (other than vacation payments and payments provided under a retirement plan) and any other disability benefits paid for in whole or in part by any other employer.

The brochure contained no choice of law provision.

Mr. Hepler worked for W. B. Saunders Company for approximately 5 months and received a total of $15,374.15 in commissions. On October 17, 1980, he sustained a back injury and was hospitalized on October 20. Mr. Hepler subsequently filed a claim for disability benefits under the long–term disability plan. It was his understanding from reading the brochure that he would be entitled to benefits

beginning on April 20, 1981.

Mr. Hepler also applied for social security and workers' compensation benefits. His social security claim was denied, but he later received monthly payments of $886.88 in connection with his workers' compensation claim. These payments were payable to Mr. Hepler and his family. The Washington State Department of Labor and Industries sent information concerning these benefits to CBS's office in New York, rather than Pennsylvania where the claim was being processed. As a result, the processing of Mr. Hepler's disability claim under the plan was delayed.

In July 1981, Mr. Hepler telephoned the home office in Pennsylvania about the delay and was advised everything was in order and he would be hearing from CBS in the near future. In early August, Mr. Hepler received a telephone call from the benefits coordinator for W. B. Saunders Company who advised him she had a check for him in the amount of $1,468.93, his benefits through July 1981. When Mr. Hepler indicated his benefits should be more, she advised him his benefits were being calculated on an artificial salary base of $800 a month. This was the first time he was aware his benefits would be determined on any basis other than a monthly average of his commissions.

Mr. Hepler filed suit against CBS, claiming breach of contract, violation of the Washington Consumer Protection Act, and fraud. He also asserted the laws of the State of Pennsylvania governed this case pursuant to the employment agreement, and he was entitled to punitive damages in connection with his fraud claim. CBS answered, contending its use of the artificial base salary was authorized under the terms of the plan, and its conduct did not constitute a consumer protection violation.

Prior to trial, Mr. Hepler filed a demand for an advisory jury. This request was denied by the trial court. The court reserved judgment whether Pennsylvania or Washington law applied to this case with respect to punitive damages.

At trial, Mr. Hepler testified he relied solely on the information contained in the plan brochure when he

decided to enroll. Since he was paid straight commissions, and did not receive a regular salary, he knew of no other method of calculating his basic monthly earnings except by taking an average of his total commissions for the 5 months he worked. Only later did he become aware the deductions for his contributions had consistently been $3 and had been based upon an artificial salary utilized by the plan administrators for first–year commission salesmen.

The director of personnel benefits for CBS testified the long–term disability plan is funded entirely through employee contributions except for administrative costs, which are paid by CBS. He further testified it is common practice in the industry to utilize an artificial salary base for first–year employees who have no regular or fixed monthly income. He also stated it would be impractical to attempt to determine what a commission salesman's contribution would be without utilizing an artificial salary base. Of the 18,000 CBS employees enrolled in the plan, approximately 3,000 have been given an artificial salary base for purposes of disability benefits.

The director of personnel benefits also testified the restrictive clause found in the brochure's definition of "basic monthly earnings" was intended to allow the plan administrators to set a fixed salary base for employees such as Mr. Hepler, who had no regular earnings. The director further testified the plan was established under ERISA and had been drawn up by CBS's legal department.

At the close of trial, the court in an oral opinion found the restrictive clause in the definition of basic monthly earnings necessarily indicated some kind of adjustment was to be made when an employee had no regular pay. The court rejected Mr. Hepler's interpretation of the contract provision and concluded no breach of contract had occurred. The court further concluded the evidence failed to prove fraud or that CBS's conduct constituted a consumer protection violation.

In a revised opinion, the court reversed itself, finding its previous decision erroneous. The court concluded the lan-

guage of the plan was ambiguous and Mr. Hepler's interpretation of basic monthly earnings was the more reasonable interpretation. The court also concluded CBS's use of an artificial salary base constituted a violation of its statutory obligations as an insurance company; therefore, its conduct involved a per se violation of the Consumer Protection Act. However, the court affirmed its previous decision denying Mr. Hepler's claim of fraud, and also concluded Pennsylvania law was inapplicable.

The court assessed damages as the difference between what Mr. Hepler expected his benefits to be and what he in fact received. Mr. Hepler was awarded costs, reasonable attorney fees, and treble damages in the amount of $1,000.

■ CBS initially contends the trial court erred in rejecting CBS's interpretation of "basic monthly earnings". Therefore, CBS should not have been found liable for breach of contract. For the first time on appeal, CBS asserts the supremacy clause preempts the application of state law to this case because the benefit plan was established under ERISA and state law is incompatible with federal law. We agree. *See Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 373 U.S. 929, 10 L. Ed. 2d 248, 83 S. Ct. 1210 (1963); *Hines v. Davidowitz,* 312 U.S. 52, 67, 85 L. Ed. 581, 61 S. Ct. 399 (1941); *Savage v. Jones,* 225 U.S. 501, 533, 56 L. Ed. 1182, 32 S. Ct. 715 (1912).

In actions to enforce benefit rights under a welfare plan covered by ERISA, federal substantive law controls; state law principles may only be applied if compatible with federal policy. 29 U.S.C. § 1144(a). *See also Peckham v. Board of Trustees,* 653 F.2d 424, 426 (10th Cir. 1981); *Rehmar v. Smith,* 555 F.2d 1362 (9th Cir. 1976) (as amended on denial of rehearing January 3, 1977); *Provience v. Valley Clerks Trust Fund,* 509 F. Supp. 388 (E.D. Cal. 1981). According to the weight of federal authority, the actions of the trustee in administering an employee benefit plan must be sustained as a matter of law unless the plaintiff can prove the administrators' conduct was arbitrary and capricious. *Fine*

*v. Semet,* 699 F.2d 1091, 1093 (11th Cir. 1983); *Bayles v. Central States, Southeast & Southwest Areas Pension Fund,* 602 F.2d 97, 99–100 (5th Cir. 1979); *Peckham v. Board of Trustees, supra* at 426; *Bueneman v. Central States, Southeast & Southwest Areas Pension Fund,* 572 F.2d 1208, 1209 (8th Cir. 1978).

Here, the trial court apparently relied upon the rules that ambiguities in a contract must be resolved against the drafter, and that legitimate expectations of the insured should be upheld absent clear language to the contrary under the contract. These rules are incompatible with the arbitrary and capricious standard. *See generally Rehmar v. Smith, supra.* However, the court's decision on liability can be sustained on the basis CBS's failure to adequately disclose the use of an artificial salary base to Mr. Hepler was arbitrary and capricious, even though its interpretation of "basic monthly earnings" and its use of the artificial salary base would otherwise be supportable. *See Thomas v. French,* 99 Wn.2d 95, 659 P.2d 1097 (1983).

CBS has a fiduciary obligation to "specify the basis on which payments are made . . . from the plan." 29 U.S.C. § 1102(b)(4).[1] CBS offered no reason why this procedure for calculating benefits was not fully disclosed to Mr. Hepler. This lack of disclosure must be perceived as arbitrary and capricious in light of the fiduciary relationship which existed between the parties. Therefore, the trial court did not err in holding CBS liable under the contract.

CBS next contends the trial court erred in determining its use of the artificial salary base constituted a per se violation of the Consumer Protection Act, RCW 19.86, since federal law preempts the application of the insurance code and the Consumer Protection Act. CBS also asserts it is not

---

[1]The plan brochure also indicates the existence of a fiduciary relationship:
*"What You Have a Right to Expect*
". . .
"You have a right to expect fiduciaries—that is, the people who are responsible for the management of the LTD Plan—to act prudently and in your best interests."

in the business of insurance; therefore, the insurance code is inapplicable regardless of federal preemption.

29 U.S.C. § 1144(b)(2)(B) of the Employment Retirement Income Security Act of 1974 states:

> (B) Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

Since the plan was organized under ERISA, Mr. Hepler's cause of action against CBS for violations of the Washington insurance code and Consumer Protection Act are preempted. *Provience v. Valley Clerks Trust Fund, supra* at 392.[2]

Finally, CBS contends the trial court erred in denying its motion to amend its pleadings to conform with the proof that Mr. Hepler's benefits should be payable at the rate of 60 percent of his basic monthly earnings, rather than 75 percent of those earnings as CBS admitted in its answer. CBS's attorney stated during trial there was no dispute the workers' compensation benefits Mr. Hepler received were payable to him and to the members of his family. The plan clearly indicates benefits are payable up to 75 percent of

---

[2] Even assuming state law was not preempted, it is questionable whether CBS's conduct in administering the plan would be governed by RCW Title 48, the Washington insurance code. *See generally State ex rel. Fishback v. Universal Serv. Agency,* 87 Wash. 413, 151 P. 768 (1915). RCW 48.01.050 provides: "'Insurer' as used in this code includes every person engaged in the business of making contracts of insurance, other than a fraternal benefit society." Given the fact the long–term disability plan is an in–house program for the sole benefit of CBS employees, CBS cannot reasonably be perceived as being in the insurance business within the meaning of RCW 48.01.050. Therefore, the provisions of the insurance code are inapplicable. The trial court incorrectly determined a per se violation of the Consumer Protection Act had occurred in terms of any violation of the insurance code.

the injured party's basic monthly earnings when combined with other benefits payable both to the claimant and his family. The 60 percent rule applies only when other income is payable solely to the injured party. Since the trial court correctly applied the 75 percent rule to this case, any error pertaining to the court's refusal to allow CBS to amend its pleadings is harmless.

In support of his cross appeal, Mr. Hepler contends the trial court erred in refusing to apply Pennsylvania law with respect to his claim for punitive damages on the basis of fraud.

As previously noted, in actions to enforce benefit rights under a plan covered by ERISA, federal substantive law controls. 29 U.S.C. § 1144(a). However, where state law is compatible with federal policy, state law principles may be applied. In *Provience v. Valley Clerks Trust Fund, supra* at 391, the Federal District Court concluded a claim of fraud against the administrators of an ERISA plan is not preempted by federal law:

> [I]t now seems settled that where the state law has only an indirect effect on the plan *and* where it is one of general application which pertains to an area of important state concern, the court should find there has been no preemption.

(Footnote omitted.) Hence, the applicability of Pennsylvania state law in terms of Mr. Hepler's claim for punitive damages for fraud is not preempted.

However, Mr. Hepler's assertion the choice of law provision in the employment contract should govern this case is not well taken. As the trial court correctly stated, the employment contract and the long–term disability plan are two separate agreements, involving two entirely different matters. The choice of law provision in the employment contract cannot reasonably be construed as applying to the present dispute over long–term disability benefits.

Likewise, under conflicts of law analysis, Washington has the greatest interest in having its law apply to this case since it has the most significant contacts. *See Barr v.*

*Interbay Citizens Bank*, 96 Wn.2d 692, 697–98, 649 P.2d 827 (1981); *Werner v. Werner*, 84 Wn.2d 360, 368, 526 P.2d 370 (1974); *Potlatch Fed. Credit Union v. Kennedy*, 76 Wn.2d 806, 809, 459 P.2d 32 (1969). Mr. Hepler is a resident of this state, the payroll deduction form was completed in this state, all representations concerning the plan were made in this state, and any injury to Mr. Hepler in terms of the administration of the plan occurred in this state.

Because we have concluded Washington law was applicable, we need not address Mr. Hepler's further claim of a right to a jury trial in terms of punitive damages under Pennsylvania law. Similarly, because we have concluded the Consumer Protection Act is inapplicable, we do not address Mr. Hepler's final contention that the 1983 amendment to the Consumer Protection Act (treble damages up to $10,000) should apply to this case.

The decision concerning liability and damages for breach of contract is affirmed. The award of treble damages under the Consumer Protection Act is reversed. The award of costs and attorney fees at trial is affirmed on the basis of 29 U.S.C. § 1132(g). As the substantially prevailing party on appeal, Mr. Hepler is awarded $4,700 in attorney fees pursuant to RAP 18.1; costs will be determined after the filing of a cost bill.[3]

McINTURFF, A.C.J., and THOMPSON, J., concur.

Reconsideration denied March 26, 1985.

Review denied by Supreme Court June 7, 1985.

---

[3] In his affidavit for attorney fees, Mr. Hepler has included items purportedly related to this appeal which include, but are not limited to: redraft findings, conclusions and judgment; office conference re: reconsideration motions; research right to trial by jury—instructions; draft praecipe and writ of execution to enforce judgment; receive and review court's memorandum opinion; review plaintiff's reconsideration/new trial. For the above, he attributes 5.9 hours to the appeal and 21.9 hours to the cross appeal at $80 per hour. These are not appellate costs. They are disallowed.